Gregg D. Trautmann, Esq.
TRAUTMANN & ASSOCIATES, L.L.C.
262 East Main Street
Rockaway, New Jersey 07866
(973) 983-7700
Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CARIBBEAN BAY CLUB, LLC. (A Limited Liability Company organized under the laws of the State of Florida) | |
| Plaintiff | Civil Action No.: 2:09-cv- |
| v. | **COMPLAINT AND JURY DEMAND** |
| KENNEDY FUNDING, INC. (A New Jersey Corporation); JEFFREY WOLFER; KEVIN WOLFER; GREGG WOLFER; JOHN DOE 1 – 10 (Fictitious names for the person(s), attorneys and/or entity responsible for the damages complained of by the Plaintiff herein) | |
| Defendants | |

## Civ. Rule 10.1 Statement

**PLAINTIFF:**

CARIBBEAN BAY CLUB, LLC. is a Limited Liability Company organized under the

laws of the State of Florida.

**DEFENDANTS:**

KENNEDY FUNDING, INC., is a corporation organized under the laws of the State of

New Jersey and has its corporate offices and principal place of business located at Two

University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New

Jersey.

JEFFREY WOLFER is an individual, a citizen of the United States and a resident of the State of New Jersey.  JEFFREY WOLFER is a shareholder of KENNEDY FUNDING, INC. and maintains a business office at Two University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New Jersey.

GREGG WOLFER is an individual, a citizen of the United States and a resident of the State of New Jersey.  GREGG WOLFER is a shareholder of KENNEDY FUNDING, INC. and maintains a business office at Two University Plaza, in the City of Hackensack, County of Bergen and State of New Jersey.

KEVIN WOLFER is an individual, a citizen of the United States and a resident of the State of New Jersey.  KEVIN WOLFER is a shareholder of KENNEDY FUNDING, INC. and maintains a business office at Two University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New Jersey.

## JURISDICTION

1.  Plaintiff brings these claims against Defendants to redress violations of the statutes of the State of New Jersey and the common law.

2.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1332.

3.  The amount in controversy exceeds $75,000.00.

4.  Venue is proper in this District pursuant to 28 U.S.C. §1391.

## FACTS COMMON TO ALL COUNTS OF COMPLAINT

Plaintiff CARIBBEAN BAY CLUB, LLC by way of Complaint against the above named Defendants says:

1. CARIBBEAN BAY CLUB, LLC. (hereinafter referred to as "CBC") is a Limited Liability Company organized under the laws of the State of Florida and has its principal place of business located at 1901 South Tamaimi Trail, Suite A, in the City of Venice and the State of Florida.

2. CARIBBEAN BAY CLUB, LLC was formed on behalf of an individual named Jacques Cloutier.  Mr. Cloutier also is an owner of an entity known as J&J Homes. Inc.  That corporation is formed under the laws of the State of Florida.

3. One of the development projects that had been being pursued by Mr. Cloutier through J&J Homes, Inc. in the State of Florida was known as "Caribbean Bay Club".  In furtherance of those efforts Mr. Cloutier caused CARIBBEAN BAY CLUB, LLC to be formed.

4. KENNEDY FUNDING, INC., (hereinafter referred to as "KFI")is a corporation organized under the laws of the State of New Jersey.

5. KFI has its corporate headquarters and principal place of business located at Two University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New Jersey.

6. JEFFREY WOLFER is, upon information and belief, a resident of the State of New Jersey.

7. JEFFREY WOLFER maintains a business office at Two University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New Jersey.

8. JEFFREY WOLFER is the President and Co-Chief Executive Officer of KFI.

9. GREGG WOLFER is, upon information and belief, a resident of the State of New Jersey and a citizen of the United States.

10. GREGG WOLFER maintains a business office at Two University Plaza in the City of Hackensack, County of Bergen and State of New Jersey.

11. In July 2006, GREGG WOLFER was an Officer and one third shareholder of KFI.

12. GREGG WOLFER currently is an Officer and shareholder of an entity known as 24Capital.

13. KEVIN WOLFER is, upon information and belief, a resident of the State of New Jersey and a citizen of the United States.

14. KEVIN WOLFER maintains a business office at Two University Plaza, Suite 402, in the City of Hackensack, County of Bergen and State of New Jersey.

15. In July 2006, KEVIN WOLFER was a Co-Chief Executive Officer of KFI.

16. KEVIN WOLFER is currently a Co-Chief Executive Officer of KFI.

17. GREGG WOLFER, KEVIN WOLFER and JEFFREY WOLFER are the sole shareholders of KFI.

18. GREGG WOLFER is a member of the credit committee at KFI.

19. KEVIN WOLFER is a member of the credit committee at KFI.

20. JEFFREY WOLFER is a member of the credit committee at KFI.

21. KFI has no written policies, guidelines or rules governing its credit committee.

22. GREGG WOLFER; KEVIN WOLFER and JEFFREY WOLFER shall be referred to collectively hereafter as the "Wolfer Defendants" unless otherwise indicated.

23. KFI and the Wolfer Defendants purport to be engaged in the business of commercial real estate lending.

24. KFI and the Wolfer Defendants maintain a web-site at www.KennedyFunding.com.

25. KFI and the Wolfer Defendants claim on their web-site that "Kennedy Funding is a commercial real estate lending company that specializes in unconventional financing where speed and attention to special circumstances are critical."

26. KFI and the Wolfer Defendants claim on its web-site that they "recognize the importance of speed, and that loans must often be structured around a client's unique set of financial circumstances."

27. KFI and the Wolfer Defendants claim on its web-site that they have been providing "lightning fast service and creative funding solutions throughout North America since 1986, and internationally since 1996."

28. KFI and the Wolfer Defendants claim on its web-site that "Traditional lending institutions take their sweet time to close on multimillion dollar deals.  We think your time is too valuable to waste."

29. KFI and the Wolfer Defendants claim on its web-site that "The company credits its tremendous growth to its creative approach, stringent loan-to-value ratios, business savvy and hands-on-style, which has the principals doing work that in other lending institutions would be farmed out to 'experts'."

30. KFI and the Wolfer Defendants claim to be highly experienced in the area of commercial real estate lending.

31. KFI and the Wolfer Defendants claim to be experts in the area of commercial real estate lending.

32. KFI and the Wolfer Defendants' web-site contains various images including but not limited to a man hanging on the hands of a large clock on the outside of a building

with a caption that reads "When Your Up Against The Clock – You Can Get Millions Fast!".

33.    KFI and the Wolfer Defendants have been involved in over hundreds of other commercial real estate loan agreements with other potential borrowers.

34.    Hundreds of other potential borrowers entered into "loan commitment" agreements with KFI but did not receive any loan.

35.    In those cases referred to in the preceding paragraph, the hundreds of other potential borrowers that had paid advance fees to KFI as a condition of their receiving a "loan commitment" from KFI never received a loan from KFI.

36.    In those cases referred to in the preceding paragraphs KFI failed and refused to return the advance fees that had been paid by the hundreds of would-be borrowers.

37.    KFI and the Wolfer Defendants have engaged in a continuity of conduct with regards to the issuance of fraudulent "commitment letters" with no intention of providing a loan to borrowers in addition to the Plaintiff herein.

38.    At the time CBC entered into the aforementioned "loan commitment", KFI did not maintain any report that would reveal the amount of "loan commitments" it had entered into that remained outstanding.

39.    At the time CBC entered into the aforementioned "loan commitment", KFI did not maintain any report that would reveal the amount of money its alleged participants could provide to fund KFI "loan commitments".

40.    In or around May 2006 CBC began to seek a loan in the amount of $28,000,000.00.

41.    The funds sought by CBC were to be utilized for general business purposes.

42.     CBC had engaged the services of SHERRI SWENSON at a loan brokerage referred to as SEA SIDE LENDING, INC. in order to locate the financing it sought.

43.     In preparation for obtaining a loan for CBC, Seaside Lending, Inc. engaged the services of Entreken Associates, Inc. to conduct an appraisal for the "Bella Venetia" land.

44.     The "Bella Venetia" land was owned by CBC.

45.     The "Bella Venetia" property was to act as the collateral for the loan being sought by CBC.

46.     The "Bella Venetia" land consisted of 407.14 acres located at 899 Knights Trail Road, Venice, Florida.

47.     The appraisal of the "Bella Venetia" property undertaken at the request of Seaside Lending, Inc. was conducted by Michael T. Twitty.

48.     Michael T. Twitty is a State-Certified General Appraiser having been granted a license as such numbered 1723.

49.     Mr. Twitty's assignment was to estimate the "As Is" market value of the "Bella Venetia" property.

50.     Mr. Twitty issued an appraisal report dated May 30, 2006.

51.     Mr. Twitty determined that the "As Is" market value of the "Bella Venetia" property as of May 24, 2006, was $46,000,000.

52.     At the time CBC sought the $28,000,000.00 loan, KFI had a line of credit available to it in the amount of $20,000,000.

53.     CBC intended to offer the "Bella Venetia" property as collateral for that loan.

54. On June 29, 2006, KFI issued what it termed a "LETTER OF INTEREST" to Jacques Cloutier.

55. KFI and the Wolfer defendants were aware of the Entreken Associates appraisal prior to issuing the so-called "LETTER OF INTEREST" to Jacques Cloutier.

56. The "LETTER OF INTEREST" provided that in order for KFI to issue a "loan commitment" the sum of $10,000 would have to be paid to KFI.

57. The "LETTER OF INTEREST" also provides that an advance fee of 3% percent would be payable to KFI in payment of that corporation's agreement to enter into the loan commitment.

58. The "LETTER OF INTEREST" also provides that the 3% advance fee that would be payable to KFI would be paid half at the time of the execution of the "loan commitment" and the remaining half at the time of closing.

59. On July 12, 2006, Jacques Cloutier caused $10,000 to be paid via wire transfer to the operating account of KFI.  That payment was made on behalf of CBC.

60. On July 14, 2006, Jacques Cloutier caused $150,000 to be paid via wire transfer to the operating account of KFI.  That payment was made on behalf of CBC.

61. The total amount paid by or on behalf of CBC to KFI was $160,000.

62. The advance fee referred to in the June 29, 2006, "LETTER OF INTEREST", is calculated on the stated loan amount not the later loan offer made by KFI.

63. The advance fee to be paid by CBC to KFI pursuant to the "loan commitment" was stated to be $830,000.

64. The "loan commitment" in this matter was executed by Jacques Cloutier on behalf of CBC on July 14, 2006.

65. The "loan commitment" in this matter was executed by Kevin Wolfer on behalf of KFI on July 14, 2006.

66. The "loan commitment" provides that it may be executed in counterpart.

67. The July 14, 2006 "loan commitment" executed on behalf of CBC was for a loan in the amount of $28,000,000.00.

68. Page 1 of the July 14, 2006, "loan commitment" states at the section entitled "AMOUNT OF LOAN:" "[a] Loan of Twenty Eight Million Dollars ($28,000,000) including the FEE, fees and costs in accordance with Schedule A attached."

69. In July 2006, the total line of credit available to KFI was a $20,000,000.00.

70. The advance fee due under the July 14, 2006, "loan commitment" was a total of $830,000.00.

71. The advance fee due under the July 14, 2006, "loan commitment" was to be paid in installments with the first installment being $150,000.00. The first installment was due at the time of the execution of the "loan commitment".

72. The second installment of advance fee due under the July 14, 2006, "loan commitment" was stated to be $690,000.00.

73. The $690,000.00 installment of advance fee due under the July 14, 2006, "loan commitment" was to be paid at the time of closing.

74. Additionally, there was another fee due under the July 14, 2006, "loan commitment". That fee was apparently a fee for making the loan and was stated to be 4% of the Loan Amount. That amount was calculated at "SCHEDULE A" of the "loan commitment" to be $1,120,000.

75.   The July 14, 2006, "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Eight Hundred Thirty Thousand Dollars ($830,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

76.   The July 14, 2006, "loan commitment" states at page 4 that "[t]his letter will become a commitment once signed by all parties and returned with the Eight Hundred Thirty Thousand Dollars ($830,000) as outlined above."

77.   The July 14, 2006, "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Eight Hundred Thirty Thousand Dollars ($830,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Limitation of Damages clauses, KFI will accept payment of the Eight Hundred Thirty Thousand Dollars ($830,000)  in the following manner:

a.   One Hundred Forty Thousand Dollars ($140,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than July 14, 2006, time of the essence;

b.   Six Hundred and Ninety Thousand Dollars ($690,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In addition, any default by the Borrower under this commitment, or other failure

of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

78. The date set for closing in the July 14, 2006, "loan commitment" was July 26, 2006. The "loan commitment" further provided that the time for closing was being made of the essence.

79. KFI and the Wolfer Defendants engaged the services of Volpe Real Estate Advisors for the purposes of evaluating the property that was to serve as the collateral for loan.

80. Volpe Real Estate Advisors is an entity owned and operated by Bernard Volpe.

81. Bernard Volpe is not a licensed appraiser.

82. Bernard Volpe has never received any formal training as an appraiser.

83. Bernard Volpe's training is as an engineer.

84. Bernard Volpe has performed hundreds of evaluations on behalf of KFI.

85. Bernard Volpe is the individual that evaluated the subject property for Volpe Real Estate Advisors.

86. Bernard Volpe has no written standards by which he conducts his so-called evaluations of property.

87. Bernard Volpe has filed an affidavit in separate litigation on behalf of the KFI wherein he testifies that he is not an appraiser and does not hold himself out as such. (See *Kimball Management, LLC v. Kennedy Funding, Inc. et al.*, Docket Number 2:05-cv-70972, venued in the United States District Court for the Eastern District of Michigan, Document #6, filed on April 18, 2005).

88.    At the time KFI retained Volpe Real Estate Advisors to evaluate the property which CBC sought to use as collateral for the subject loan KFI and the Wolfer Defendants were aware that that Bernard Volpe was not a licensed appraiser.

89.    Despite having the knowledge that Bernard Volpe is not an appraiser KFI and the Wolfer Defendants in fact permitted Bernard Volpe through his company, Volpe Real Estate Advisors to complete the evaluation of the property that was to act as the collateral for the CBC loan which was the subject of the "loan commitment".

90.    In the CBC matter, Volpe Real Estate Advisors, Inc. declared that the "as is" value of the property was $21,900,000.

91.    By way of a letter dated July 24, 2006, KEVIN WOLFER advised CBC that KFI had "concluded its initial review and due diligence concerning the value of the Collateral for the proposed Loan." KEVIN WOLFER went on to state that ". . . KFI is prepared to proceed to a closing for a Loan in the amount of $13,140,000."

92.    Despite the fact that "loan commitment" called for a July 26, 2006 closing date, which time was made of the essence, KFI failed to take any steps to close the loan.

93.    In fact, once KENNEDY FUNDING, INC. received the advance fee on behalf of CBC their actions were limited to sending an unqualified person to evaluate the value of the collateral and otherwise deflecting the efforts of CBC and its agents to close the subject loan.

94.    Bernard Volpe's appraisal in this matter were arrived at using the "Subdivision Development Method" of appraisals.

95.    The "Subdivision Development Method" is not generally accepted by the appraisal community.

96. In fact, the "Subdivision Development Method" is considered by many appraisal professional to be the least accurate method for appraising property.

97. The decision by BERNARD VOLPE to reduce the "as completed" evaluation of the real property was completely subjective and not tied to any generally recognized appraisal standards.

98. Neither of BERNARD VOLPE's evaluations rendered with regards to the CBC loan recited any accepted appraisal standards nor do they indicate compliance therewith.

99. KFI never made a loan to the CBC.

100. KFI never returned any of the monies paid to it on behalf of CBC.

101. In the event KFI was unable to perform its obligations under the "loan commitment" the funds paid on behalf of CBC were to be returned to CBC.

102. KFI and its representatives had ample time to consider the nature of the loan that the Plaintiff was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

103. KFI and its shareholders contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to the Plaintiff.

104. KFI and the Wolfer Defendants issued a document in the loan transaction that they were involved in with CBC, which they termed a "loan commitment".

105. The purpose of the aforementioned "loan commitment" was to ensure CBC that KFI had agreed to loan funds to CBC subject to the conditions set forth in that "loan commitment".

106.   Another purpose of the loan commitment was to ensure CBC that KFI had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

107.   At no time during the transaction did KFI or the Wolfer Defendants have the funds necessary to make the loan to CBC as contemplated by the "loan commitment" in their financial accounts.

108.   At no time during the transaction did KFI or the Wolfer Defendants have the funds necessary to make the loan to CBC as contemplated by the "loan commitment" readily available to them.

109.   At no time did KFI or the Wolfer Defendants provide any information to the Plaintiff that it had secured or attempted to secure funds from any person or entity which was to act as a participant in the funding of the loan principal.

110.   At no time did KFI or the Wolfer defendants advise Plaintiff that they had not made inquiry of any purported co-lender or participant to provide full or partial funding of the loan sought by Plaintiff.

111.   Had the Plaintiff known that KFI and the Wolfer Defendants did not have funds sufficient to make the requested loan in their financial accounts or readily available to them or had received actual and reasonable commitments from co-lenders or other participants, the Plaintiff would not have executed the "loan commitment" and would not have forwarded any funds to KFI.

112.   KFI and the Wolfer defendants never had any intention of making a loan to CBC.

113.   KFI and the Wolfer defendant knew they did not intend to make a loan to CBC prior to issuing the so-called "LETTER OF INTEREST".

114.    KFI and the Wolfer defendant knew they did not intend to make a loan to CBC prior to issuing the so-called "loan commitment".

115.    KFI claims not to be committed to loan funds until after a loan offer, made subsequent to the "loan commitment," is accepted by a borrower.

116.    As a result of the Plaintiff not receiving the agreed upon loan from KFI, the Plaintiff suffered damages.

117.    As a result of the Plaintiff not receiving the agreed upon loan from KFI, the Plaintiff suffered consequential damages.

**QUALITY SIGNATURE HOMES, INC.**

118.    Another instance in which KENNEDY FUNDING entered into a "loan commitment", received an advance fee, failed to close any loan yet retained the advance fee is the transaction involving a Florida entity known as QUALITY SIGNATURE HOMES, INC. (hereinafter referred to as "Quality").

119.    QUALITY is a corporation organized under the laws of the State of Georgia and has its principal place of business located at 5720 Buford Highway, Suite 309, Norcross, Georgia.  That corporation was formed by an individual by the name of Michael Usuriaga.

120.    In or around September 2005 Quality began to seek a loan in the amount of $13,500,000.00 for the purchase and development of a certain tract of land located within the State of Georgia.

121.    In order to obtain the loan, Quality enlisted the services of Raul Corpion, a broker with a company known as Interamerican Commercial Services.

122. On or about September 29, 2005 Mr. Corpion submitted a loan request to KFI on behalf of Quality.

123. On October 6, 2005, KFI issued what it termed a "LETTER OF INTEREST" to Quality.

124. The "LETTER OF INTEREST" provided that in order for KFI to issue a "loan commitment" the sum of $10,000.00 would have to be paid to KFI.

125. The "LETTER OF INTEREST" also provides that an advance fee of 3% percent would be payable to KFI in payment of that corporation's agreement to enter into the loan commitment.

126. The 3% advance fee referred to in the October 6, 2005, "LETTER OF INTEREST", is calculated on the stated loan amount not the later loan offer made by KENNEDY FUNDING.

127. In or around October 2005, Quality paid $10,000.00 to KENNEDY FUNDING so that entity would prepare a "loan commitment."

128. Following the payment of $10,000.00 to KENNEDY FUNDING by Quality and November 7, 2005 multiple drafts of the "loan commitment" were exchanged between the parties.

129. The advance fee to be paid by Quality to KENNEDY FUNDING pursuant to the "loan commitment" was stated to be $395,000.00.

130. The "loan commitment" in this matter was executed by Michael Usuriaga on behalf of Quality on November 7, 2005.

131. The "loan commitment" in this matter was executed by GREGG WOLFER on behalf of KENNEDY FUNDING, INC. on November 7, 2005.

132. The November 7, 2005 "loan commitment" was for a loan in the amount of $13,500,000.00.

133. Page 2 of the November 7, 2005 "loan commitment" states at the section entitled "AMOUNT OF LOAN:" "[a] Loan of Thirteen Million Five Hundred Thousand Dollars ($13,500,000) including the FEE, fees and costs in accordance with Schedule A attached."

134. On November 7, 2005, the total line of credit available to KFI and the Wolfer Defendants was a $5,000,000.00.

135. The advance fee due under the November 7, 2005 "loan commitment" was a total of $395,000.00.  That advance fee was to be paid in installments with the first installment being $110,000.00.  The second installment was to be $82,500.00.  The balance of the advance fee was to be paid at the time of closing.

136. Additionally, there was another fee due under the November 7, 2005, "loan commitment".  That fee was apparently a fee for making the loan and was stated to be 3% of the Loan Amount.  That amount was calculated at "SCHEDULE A" of the "loan commitment" to be $405,000.

137. Also on November 7, 2005, Quality sent $110,000.00 to KFI.

138. After November 7, 2005, Quality sent $82,500.00 to KFI.

139. The November 7, 2005  "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Three Hundred Ninety Five Thousand Dollars ($395,000) which

is non-refundable and earned for, among other things, the commitment to provide funds."

140. The November 7, 2005 "loan commitment" states at page 4 that "[t]his letter will become a commitment once signed by all parties and returned with the Three Hundred Ninety Five Thousand Dollars ($395,000) as outlined above."

141. The November 7, 2005 "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Three Hundred Ninety Five Thousand Dollars ($395,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Three Hundred Ninety Five Thousand Dollars ($395,000) in the following manner:

a. One Hundred ten Thousand Dollars ($110,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than November 7, 2005, time of the essence;

b. Eighty Two Thousand Five Hundred Dollars ($82,500) to be paid no later than November 8, 2005, time of the essence;

c. Two Hundred Two Thousand Five Dollars ($202,500) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing. In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this

commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

142. The date set for closing in the November 7, 2005, "loan commitment" was December 2, 2005. The "loan commitment" further provided that time was being made of the essence.

143. KFI and the Wolfer Defendants engaged the services of Volpe Real Estate Advisors for the purposes of evaluating the property that was to serve as the collateral for loan.

144. Volpe Real Estate Advisors is an entity owned and operated by Bernard Volpe.

145. Bernard Volpe is not a licensed appraiser.

146. Bernard Volpe's training is as an engineer.

147. Bernard Volpe has filed an affidavit in separate litigation on behalf of the Kennedy Funding wherein he testifies that he is not an appraiser and does not hold himself out as such. (See *Kimball Management, LLC v. Kennedy Funding, Inc. et al.*, Docket Number 2:05-cv-70972, venued in the United States District Court for the Eastern District of Michigan, Document #6, filed on April 18, 2005).

148. Bernard Volpe has performed hundreds of evaluations on behalf of Kennedy Funding.

149. Bernard Volpe is the individual that evaluated the subject property for Volpe Real Estate Advisors.

150. At the time KFI retained Volpe Real Estate Advisors to evaluate the property which Quality sought to use as collateral for the subject loan KENNEDY FUNDING and the Wolfer Defendants were aware that that Bernard Volpe was not a licensed appraiser.

151. Despite having the knowledge that Bernard Volpe is not an appraiser KFI and the Wolfer Defendants in fact permitted Bernard Volpe through his company, Volpe Real Estate Advisors to complete the evaluation of the property that was to act as the collateral for the Quality loan which was the subject of the "loan commitment".

152. In the Quality matter, Volpe Real Estate Advisors, Inc. declared that the "as is" value of the property was $10,330,000.

153. By way of a letter dated November 16, 2005, KEVIN WOLFER advised Quality that KFI had "concluded its initial review and due diligence concerning the value of the Collateral for the proposed Loan."  KEVIN WOLFER went on to state that ". . . KFI is prepared to proceed to a closing for a Loan in the amount of $6,715,000."

154. Quality then sought to have a second appraisal of the property performed, however on November 28, 2005, KEVIN WOLFER indicated that a second appraisal could delay closing for approximately 4 weeks.

155. Faced with the possibility of losing potential end use buyers of properties by delaying an additional 4 weeks, Quality determined it was in their best interest to close the loan as unilaterally amended by KFI's November 28, 2005 written loan offer.

156. On November 28, 2008 Quality wrote to KEVIN WOLFER and advised that Quality was accepting the loan offer of $6,715,000.

157. Quality reiterated this acceptance in a November 30, 2005 letter to KEVIN WOLFER.

158. On December 1, 2006, KEVIN WOLFER wrote to Quality and confirmed that Quality has accepted KENNEDY FUNDING, INC.'s loan offer of $6,715,000.

159. Despite the fact that "loan commitment" called for a December 2, 2005 closing date, which time was made of the essence, KFI failed to take any steps to close the loan until December 5, 2005 when KEVIN WOLFER wrote to QUALITY, extending the "loan commitment" to December 13, 2005.

160. On December 19, 2005 KEVIN WOLFER wrote to QUALITY, extending the "loan commitment" once more, this time to December 29, 2005.

161. The aforementioned extensions were all do the fact that KFI and the WOLFER DEFEDANTS all failed to take any action toward closing the loan.

162. In fact, once KFI received the advance fee from QUALITY their actions were limited to sending an unqualified person to evaluate the value of the collateral and otherwise deflecting the efforts of the QUALITY and its agents to close the subject loan.

163. In or around March, 2006 KFI began to indicate that they would not close the loan as offered to QUALITY and instead insisted that QUALITY execute a new "loan commitment."

164. The second "loan commitment" in this matter was executed by Michael Usuriaga on behalf of QUALITY on March 8, 2006.

165. The second "loan commitment" in this matter was executed by JOSEPH WOLFER on behalf of KFI on March 8, 2006.

166. The second "loan commitment" stated that it superseded all other loan commitments.

167. The loan amount in the second "loan commitment" was $6,715,000.00.

168. The loan amount set forth in the second "loan commitment" ($6,715,000.00) was the same amount as the "loan offer" ($6,715,000.00) made by KFI after it had executed the first "loan commitment" which had a loan amount of $13,500,000.

169. The advance fee due under the March 8, 2006 "loan commitment" between KFI and QUALITY was a total of $202,500.00.

170. The March 8, 2006 "loan commitment" between KFI and QUALITY states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Two Hundred Two Thousand Five Hundred Dollars ($202,500) which is non-refundable and earned for, among other things, the commitment to provide funds."

171. The March 8, 2006 "loan commitment" between KFI and QUALITY states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Two Hundred Two Thousand Five Hundred Dollars ($202,500) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Two Hundred Two Thousand Five Hundred Dollars ($202,500) in the following manner:

a. One Hundred Dollars ($100) to be paid no later than March 8, 2006, time of the essence;

b. Two Hundred Two Thousand Four Hundred Dollars ($202,400) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing. In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by

Borrower of any fact or state of facts to KFI either in connection with this

Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

172. The March 8, 2006 "loan commitment" between KFI and QUALITY makes no explicit mention of the loan commitment previously paid to KFI pursuant to the November 7, 2005 "loan commitment."

173. Subsequent to the execution of the March 8, 2006 "loan commitment" between KFI and QUALITY, KFI and the WOLFER DEFENDANTS once again sent Bernard Volpe to the property to perform a second evaluation of the property that was to act as collateral for the loan.

174. In the several months between his evaluations of the property significant progress had been made on infrastructure and other improvements to the property.

175. Bernard Volpe was to conduct his second evaluation of the property on an "as completed" basis.

176. Bernard Volpe's two appraisals in this matter were arrived at using the "Subdivision Development Method" of appraisals.

177. The "Subdivision Development Method" is not generally accepted by the appraisal community.

178. In fact, the "Subdivision Development Method" is considered by many appraisal professional to be the least accurate method for appraising property.

179. Despite the progress made on the project and the fact that three months previously he had stated the "as is" value of the property was $10,330,000, Bernard Volpe now stated that the property had an "as completed" value of only $10,113,000.

180. Thus Bernard Volpe opined that the property would have less value when construction of dozens of new homes were completed versus the value of raw land.

181. Bernard Volpe indicated that the lower "as completed" appraisal was due to a change in the "absorption rate."

182. Bernard Volpe did not indicate how he arrived at the "absorption rate" that he employed in rendering his opinion.

183. Bernard Volpe did not indicate all of the factors included in calculating the "absorption rate" that he employed in rendering his opinion.

184. BERNARD VOLPE arrived at his values utilizing a "discounted cash flow spreadsheet" that he employed in rendering his opinion.

185. The "discounted cash flow spreadsheet" that BERNARD VOLPE employed in rendering his opinion with regards to the QUALITY matter was never provided to the QUALITY.

186. BERNARD VOLPE did not indicate what figures he utilized in producing his "discounted cash flow spreadsheet"

187. BERNARD VOLPE did not indicate where he obtained the figures he utilized in producing his "discounted cash flow spreadsheet."

188. The decision by BERNARD VOLPE to reduce the "as completed" evaluation of the real property was completely subjective and not tied to any generally recognized appraisal standards.

189. Neither of BERNARD VOLPE's evaluations rendered with regards to the QUALITY loan recited any accepted appraisal standards nor do they indicate compliance therewith.

190. BERNARD VOLPE knew that KFI and the Wolfer Defendants were utilizing his services to further the fraud they were committing on QUALITY.

191. BERNARD VOLPE should have known that KFI and the Wolfer Defendants were utilizing his services to further the fraud they were committing on QUALITY.

192. KFI never made a loan to QUALITY.

193. KFI never returned any of the monies paid to it by QUALITY.

194. In the event KFI was unable to perform its obligations under the "loan commitment" the funds paid by the Plaintiff were to be returned to QUALITY.

195. KFI and its representatives had ample time to consider the nature of the loan that QUALITY was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

196. KFI and its shareholders contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to QUALITY.

197. KFI and the Wolfer Defendants issued a document in the loan transaction that they were involved in with QUALITY, which they termed a "loan commitment".

198. The purpose of the aforementioned "loan commitments" were to ensure QUALITY that KFI had agreed to loan funds to QUALITY subject to the conditions set forth in that "loan commitment".

199. Another purpose of the loan commitment was to ensure QUALITY that KFI had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

200. At no time during the transaction did KFI or the Wolfer Defendants have the funds necessary to make the loan to the Plaintiff as contemplated by the "loan commitment" in their financial accounts.

201. At no time during the transaction did KFI or the Wolfer Defendants have the funds necessary to make the loan to the Plaintiff as contemplated by the "loan commitment" readily available to them.

202. At no time did KFI or the Wolfer Defendants provide any information to the Plaintiff that it had secured or attempted to secure funds from any person or entity which was to act as a participant in the funding of the loan principal.

203. KFI claims not be committed to loan funds until after a loan offer, made subsequent to the "loan commitment," is accepted by a borrower.

204. As a result of QUALITY not receiving the agreed upon loan from Kennedy Funding, the QUALITY was unable to develop the subject property and earn substantial profits.

**Pine Long, LLC**

205. Another instance in which KFI and the Wolfer Defendants entered into a "loan commitment", received an advance fee, failed to close any loan yet retained the advance fee is the transaction involving a Florida entity known as Pine Long, LLC [hereinafter referred to as "Pine Long"].

206. Pine Long, LLC is a corporation organized under the laws of the State of Florida.

207. That Limited Liability Company was formed by a gentlemen by the name of Micky Whitaker.

208.    In or around early 2006 a broker by the name of Billy Hebert contacted KFI to ascertain their interest in making a $16,000,000.00 loan to an entity that would later become known as Pine Long, LLC.

209.    On March 10, 2006, KFI issued what it termed a "LETTER OF INTEREST" to Pine Long.  That document provided that in order for KFI to issue a "loan commitment" the sum of $10,000.00 would have to be paid to KFI  That document also provides that an advance fee of 3% percent would be payable to KFI in payment of that corporation's agreement to enter into the loan commitment.

210.    On March 14, 2006, KFI issued what it termed a "REVISED LETTER OF INTEREST" to Pine Long.  That document provided that in order for KFI to issue a "loan commitment" the sum of $10,000.00 would have to be paid to KFI  That document also provides that an advance fee of 3% percent would be payable to KFI in payment of that corporation's agreement to enter into the loan commitment.

211.    The 3% advance fee referred to in the March 10, 2006, "LETTER OF INTEREST", the March 14, 2006, "REVISED LETTER OF INTEREST" and the March 23, 2006, "loan commitment" is calculated on the stated loan amount not the later loan offer made by KENNEDY FUNDING, INC.  In the case of Pine Long the advance fee was stated to be $410,000.00.

212.    On March 15, 2006, an initial draft of the proposed "loan commitment" was sent to Pine Long.  That provided that amount of loan was $14,000,000.00.  The date set for closing in that document was April 17, 2006.  The date for closing was said to have been made "time of the essence."

213.    On March 20, 2006, a second draft of the proposed "loan commitment" was sent to Pine Long.  That provided that amount of loan was $14,000,000.00.  The date set for closing in that document was April 17, 2006.  The date for closing was said to have been made "time of the essence".

214.    On March 21, 2006, a third draft of the proposed "loan commitment" was sent to Pine Long.  That provided that amount of loan was $14,000,000.00.  The date set for closing in that document was April 17, 2006.  The date for closing was said to have been made "time of the essence".

215.    The advance fee due under the proposed Pine Long, "loan commitment" was a total of $410,000.00.  That advance fee was to be paid in installments with the first installment being $210,000.00.  The balance of the advance fee was to be paid at the time of closing.

216.    Additionally, there was another fee due under the Pine Long, "loan commitment".  That fee was apparently a fee for making the loan and was stated to be 4% of the Loan Amount.  That amount was calculated at "SCHEDULE A" of the "loan commitment" to be $560,000.

217.    On March 23, 2006, Micky Whitaker on behalf of Pine Long, LLC, executed a document entitled a "loan commitment".  That document was executed by a representative of KENNEDY FUNDING on that same day.

218.    Also on March 23, 2006 Pine Long, LLC, sent $265,000.00 to KENNEDY FUNDING in payment of the advance fee charged for the subject loan.

219.    The Pine Long "loan commitment" states that the loan amount will be $14,000,000.00.

220. This is despite the fact that Kennedy Funding and the Wolfer Defendants only had a $5,000,000.00 line of credit as stated above.

221. The Pine Long "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Four Hundred Ten Thousand Dollars ($410,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

222. The Pine Long "loan commitment" states at page 4 that "[t]his letter will become a commitment once signed by all parties and returned with the Four Hundred Ten Thousand Dollars ($410,000) as outlined above."  That paragraph further states "[t]his commitment will expire on April 17, 2006, time of the essence."

223. The Pine Long "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Four Hundred Ten Thousand Dollars ($410,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Four Hundred Ten Thousand Dollars ($410,000) in the following manner:

   a. Two Hundred ten Thousand Dollars ($210,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than March 23, 2006, time of the essence;

b.    Two Hundred Thousand Dollars ($200,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

224.    The date set for closing in the March 23, 2006, "loan commitment" was April 17, 2006.  The "loan commitment" further provided that time was being made of the essence.

225.    By way of a letter dated March 30, 2006, GREGG WOLFER acknowledged that Micky Whitaker was desirous of working with KENNEDY FUNDING, INC.'s attorneys due to his "desire to close quickly".  GREGG WOLFER advised Mr. Whitaker that the law firm of Cole, Schotz, Meisel, Foreman & Leonard would be representing KENNEDY FUNDING, INC. and that Mr. Whitaker should wire transfer an additional $10,000.00 to that firm in order for them to begin to work on the proposed transaction.  He further indicated that "upon receipt, a closing checklist and draft loan document will be provided for review by you and your counsel."

226.    The draft preliminary closing checklist was sent to Pine Long for the first time on April 19, 2006.

227.    By way of a letter dated April 4, 2006, which was sent via facsimile on April 5, 2005, KEVIN WOLFER advised Micky Whitaker that KENNEDY FUNDING, INC. had "concluded its initial review and due diligence concerning the value of the Collateral

for the proposed Loan."  KEVIN WOLFER went on to state that ". . . KFI was prepared to proceed to a closing for a Loan in the amount of $8,370,000."

228.   On April 28, 2006, KEVIN WOLFER wrote to Micky Whitaker and stated that KENNEDY FUNDING, INC. would extend the loan commitment until May 3, 2006.

229.   On May 1, 2006, counsel for KENNEDY FUNDING, INC. began referencing an "updated closing checklist".

230.   On May 3, 2006, KEVIN WOLFER wrote to Micky Whitaker and stated that KENNEDY FUNDING, INC. would extend the loan commitment until May 9, 2006.

231.   On May 11, 2006, KEVIN WOLFER wrote to Micky Whitaker and stated that KENNEDY FUNDING, INC. would extend the loan commitment until June 11, 2006, provided that Mr. Whitaker pay another $100,000.00.  Both the date by which the additional $100,000.00 was to be paid and the date to which the loan was to be extended to were made "time of the essence".

232.   Once Pine Long had paid the last of the $265,000.00 to Kennedy Funding a pattern emerged where the Wolfer defendants and Kennedy Funding began to systematically block all efforts by Pine Long and its representatives from completing the proposed transaction.

233.   Kennedy Funding never made a loan to Pine Long.

234.   In the event Kennedy Funding was unable to perform its obligations under the "loan commitment" the funds paid by Pine Long were to be returned to Pine Long.

235.   Kennedy Funding and its representatives had ample time to consider the nature of the loan that Pine Long was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

236. Kennedy Funding and its shareholders contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to Pine Long.

237. Kennedy Funding and the Wolfer Defendant issued a document in the loan transaction that they were involved in with Pine Long, which they termed a "loan commitment".

238. The purpose of the aforementioned "loan commitment" was to ensure Pine Long that Kennedy Funding had agreed to loan $14,000,000.00 to Pine Long subject to the conditions set forth in that "loan commitment".

239. Another purpose of the loan commitment was to ensure Pine Long that Kennedy Funding had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

240. At no time during the transaction did KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to Pine Long as contemplated by the "loan commitment" in their financial accounts.

241. At no time during the transaction did KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to Pine Long as contemplated by the "loan commitment" readily available to them.

242. At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Pine Long that it had secured or attempted to secure funds from

any person or entity which was to act as a participant in the funding of the loan principal.

243. As a result of Pine Long not receiving the agreed upon loan from KENNEDY FUNDING, Pine Long was faced with forfeiting its $1,500,000.00 earnest money deposit.

244. In an effort to save its earnest money deposit Pine Long was able to close the real estate transaction.

245. In order to close, the Seller of that property agreed to provide temporary partial financing to Pine Long for 60 days, in order to permit Pine Long to obtain permanent financing.

246. In order to obtain the sums necessary to finalize the transaction with the Seller, Pine Long encumbered other assets.

247. Pine Long was unable to secure permanent financing in those 60 days and the Seller of the property foreclosed on the property.

248. Further, the other assets that were encumbered in order to close the transaction were also foreclosed upon.

249. Thus Pine Long lost substantial sums of money as a result of the KENNEDY FUNDING's failure to fund the loan.

250. As a result of Pine Long not receiving the agreed upon loan from KENNEDY FUNDING, Pine Long was unable to develop the subject property and earn substantial profits.

**Moser-Downum Investment Group, LLC,**

251. Another instance in which KENNEDY FUNDING entered into a "loan commitment", received an advance fee, failed to close any loan yet retained the advance fee is the transaction involving a California entity known as Moser-Downum Investment Group, LLC [hereinafter referred to as "Moser-Downum"].

252. Moser-Downum was an entity formed with the purpose of developing properties throughout the western United States.

253. John Moser, MD was one of the forming members of Moser-Downum, LLC.

254. In approximately September 2006 a mortgage brokerage entity known as Star Funding contacted Moser-Downum to advise of an investment development property that was then part of a bankruptcy action.  Star Funding advised Moser-Downum that the property was ready to be developed and that Star Funding already had financing in place.

255. The financing that was "in place" was to come from KENNEDY FUNDING.

256. As a result, representatives of Moser-Downum had approximately three conversations with JEFFREY WOLFER.  During those conversations Moser-Downum advised JEFFREY WOLFER and KENNEDY FUNDING that in order to qualify to act as the "stalking horse" bidder in the bankruptcy action it was necessary to ensure that purchase financing was in place.

257. KENNEDY FUNDING and JEFFREY WOLFER made both verbal assurance to Moser-Downum that KENNEDY FUNDING would finance the purchase and development of the subject premises and also thereafter entered into a "loan commitment" with Moser-Downum.

258. Moser-Downum then sought to pursue the purchase and development of what was originally approximately 800 acres of raw land located in Fresno, California.

259. As a result of receiving the verbal assurances from JEFFREY WOLFER and KENNEDY FUNDING together with the "loan commitment", a meeting was held in San Francisco on 10/30/06.

260. JEFFREY WOLFER participated in the meeting referred to in the preceding paragraph via telephone.  Present at the meeting were approximately eight attorneys each representing various parties in interest in the bankruptcy proceeding including the debtor in possession, the unsecured creditors committee, creditors of the estate and others.

261. During the 10/30/06 meeting JEFFREY WOLFER informed those in attendance that KENNEDY FUNDING could fund $65,000,000 in approximately four days.

262. On or about December 6, 2006, Moser-Downum deposited $500,000.00 of non-refundable money into the bankruptcy court and on or about December 20, 2006, Moser Downum deposited another $500,000.00 of non-refundable money into the bankruptcy court.

263. The $1,000,000.00 referred to in the preceding paragraph was required to be deposited into the bankruptcy court both as good faith money and as a demonstration of Moser-Downum's ability to close the proposed transaction.

264. Moser-Downum would not have deposited the $1,000,000.00 mentioned in the preceding paragraphs in the bankruptcy court if it did not have verbal assurances from JEFFREY WOLFER and KENNEDY FUNDING of both its ability to fund the requested loan and its intention to fund the requested loan.

265. Moser-Downum would not have deposited the $1,000,000.00 mentioned in the preceding paragraphs in the bankruptcy court if it did not have the "loan commitment" from KENNEDY FUNDING.

266. As a result of agreeing to post the $1,000,000.00 of non-refundable funds, Moser-Downum was appointed by the bankruptcy judge to be the "stalking horse" bidder.

267. Being appointed "stalking horse" bidder permitted Moser-Downum to offer to purchase the subject tract of land near Fresno, California out of a bankruptcy for $36,000,000.00.

268. The subject real property was part of a master plan development adjacent to a golf course that was already in operation.

269. Further, the property was within, and serviced by, the Sierra Foothills Public Utilities District, which is a public entity.

270. The Sierra Foothills Public Utilities District committed to constructing municipal utilities such as roads, sewers and water lines within the subject property.

271. Starrr Fundings directed Moser-Downum to KFI.

272. Moser-Downum and KFI entered into a written "loan commitment" which was executed by Dr. John Moser on behalf of Moser-Downum and by JEFFREY WOLFER on behalf of KENNEDY FUNDING on October 23, 2006.

273. Under the October 10, 2006 "loan commitment", KENNEDY FUNDING had agreed to extend a loan of $65,000,000.00 to Moser-Downum.

274. The loan to Moser-Downum was not to exceed 60% of the "as completed" market value of the subject property.

275. The Moser-Downum "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of One Million Nine Hundred Forty Thousand Dollars ($1,940,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

276. The Moser-Downum "loan commitment" states at page 4 in the last paragraph that "[t]his letter will become a commitment once signed by all parties and returned with the One Million Nine Hundred Forty Thousand Dollars ($1,940,000) as outlined above."

277. The Moser-Downum "loan commitment" states at page 7 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay One Million Nine Hundred Forty Thousand Dollars ($1,940,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the One Million Nine Hundred Forty Thousand Dollars ($1,940,000) in the following manner:

a.      Six Hundred Fifty Thousand Dollars ($650,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than October 24, 2006, time of the essence;

b.      One Million Two Hundred Ninety Thousand Dollars ($1,290,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In

278. On or about October 3, 2006 Moser-Downum caused the sum of $10,000.00 to be wire transferred to the bank account of KENNEDY FUNDING.

279. On or about October 25, 2006, Moser-Downum caused the sum of $325,000.00 to be wire transferred to the bank account of KENNEDY FUNDING as a partial payment of the advanced fee against the total commitment fee contemplated in the "loan commitment".

280. JEFFREY WOLFER told John Moser, MD that the reasons why KENNEDY FUNDING required an advance fee was that KENNEDY FUNDING had to set aside money to make the loan. Jeffrey Wolfer told Dr. Moser that KENNEDY FUNDING needed to set aside the money in order to fund the loan and that it was expensive to set aside money. The second reason given was to discourage Moser-Downum from seeking alternative financing at more favorable rates.

281. On or about December 7, 2006, Moser-Downum caused the sum of $325,000.00 to be wire transferred to the bank account of KENNEDY FUNDING as a partial payment of the advanced fee against the total commitment fee contemplated in the "loan commitment".

282. An additional $325,000.00 was wired on Moser-Downum's behalf to the bank account of KENNEDY FUNDING as a partial payment of the advanced fee against the total commitment fee contemplated in the "loan commitment".

283. The total amount paid on behalf of Moser-Downum to KENNEDY FUNDING was $985,000.00.

284. The $985,000.00 paid on behalf of Moser-Downum as referred to in the preceding paragraphs represented a partial payment of the advanced fee in the amount of $1,940,000 against the total commitment fee contemplated in the "loan commitment".

285. In the event KENNEDY FUNDING elected not to proceed towards closing the $985,000.00 was to be returned to Moser-Downum.

286. In the event KENNEDY FUNDING was unable to perform its obligations under the letter commitment the $985,000.00 was to be returned to Moser-Downum.

287. KENNEDY FUNDING and its representatives had ample time to consider the nature of the loan that Moser-Downum was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

288. KENNEDY FUNDING and its shareholders contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to Moser-Downum.

289. KENNEDY FUNDING and the Wolfer Defendant issued a document in the loan transaction that they were involved in with Moser-Downum, which they termed a "loan commitment".

290. The purpose of the aforementioned "loan commitment" was to ensure Moser-Downum that KENNEDY FUNDING had agreed to loan $65,000,000.00 to Moser-Downum subject to the conditions set forth in that "loan commitment".

291. Another purpose of the loan commitment was to ensure Moser-Downum that KENNEDY FUNDING had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

292. At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Moser-Downum that it had secured or attempted to secure funds from any person or entity which was to act as a participant in the funding of the loan principal.

293. At no time during the transaction did KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to Moser-Downum as contemplated by the "loan commitment" in their financial accounts.

294. At no time during the transaction did KENNEDY FUNDING or the Wolfer Defendant have the funds necessary to make the loan to Moser-Downum as contemplated by the "loan commitment" readily available to them.

295. Subsequent to Moser-Downum executing the "loan commitment", KENNEDY FUNDING for the first time caused a document referred to as a "pre-closing checklist" to be forwarded to Moser-Downum.

296. That "pre-closing" checklist included approximately 67 items that were required to be addressed prior to any closing taking place.

297. Prior to entering into the "loan commitment" on October 23, 2006, with Moser-Downum, KENNEDY FUNDING knew that Moser-Downum was purchasing the property that was to act as collateral for the proposed loan for $36,000,000.00.

298. Pursuant to the terms of the Moser-Downum "loan commitment" KENNEDY FUNDING had the obligation to obtain both an "as is" and "as completed" appraisal of the collateral.

299. The "loan commitment" provides that "[u]pon making a determination of the 'as is' and 'as completed' value, KFI will deliver to Borrower a Loan Offer equal to Sixty Per Cent (60%) of the 'as completed' value, not to exceed the Financing Request, and will provide the Borrower with the amount of the initial advance."

300. KENNEDY FUNDING retained an entity known as "CB Richard Ellis" to appraise the property.

301. KENNEDY FUNDING only obtained an "as is" appraisal from "CB Richard Ellis" of the subject property which was to act as the collateral for the loan.

302. KENNEDY FUNDING never obtained an "as completed" appraisal of the property which was to act as the collateral for the loan.

303. Despite the fact that KENNEDY FUNDING was obligated to loan an amount not less than 60% of the "as completed" value of the collateral, Kennedy Funding nonetheless offered Moser-Downum a loan in the amount of $13,230,000.00.

304. KENNEDY FUNDING offered a loan in the amount of $13,230,000.00 despite having actual knowledge that Moser-Downum was using a portion of the proposed loan proceeds to purchase the subject property for $36,000,000.00.

305. KENNEDY FUNDING necessarily could not have performed its obligations under the so-called "loan commitment" it entered into with Moser-Downum without having obtained an "as completed" appraisal of the subject property and project.

306. KENNEDY FUNDING never made a loan to Moser-Downum.

307. Once Moser-Downum had paid the last of the $975,000.00 to KENNEDY FUNDING a pattern emerged where the Wolfer defendants and KENNEDY FUNDING began to systematically block all efforts by the plaintiff and its representatives from completing the proposed transaction.

308. As a result of Moser-Downum not receiving the agreed upon loan from KENNEDY FUNDING, Moser-Downum was unable to develop the subject property and earn substantial profits.

309. As a result of Moser-Downum not receiving the agreed upon loan from KENNEDY FUNDING, Moser-Downum was required to forfeit the $1,000,000.00 it had placed with the trustee in the bankruptcy action.

**Ruggers Acquisition and Development, LLC**

310. Another instance in which the Wolfer Defendants and KENNEDY FUNDING entered into a "loan commitment", received an advance fee, failed to close any loan yet retained the advance fee is the transaction involving a Nevada entity known as Ruggers Acquisition and Development, LLC [hereinafter referred to as "Ruggers"].

311. Ruggers was desirous of entering into a contractual agreement to purchase a certain tract of land in Laughlin, Nevada for approximately $15,000,000.00.  The proposed transaction was to include a provision that permitted the contract seller- Laughlin

Ranch, LLC – to retain an option to repurchase the subject property within one year from the date of closing for approximately $21,000,000.00.

312. The person who controlled Laughlin Ranch, LLC was a gentlemen by the name of David Lords.  The Laughlin Ranch property consists of some 10,000 acres in Arizona located across the Colorado River from casino designated land.

313. David Lords was utilizing property owned by entities he controlled as what is commonly referred to as a "land bank".

314. David Lords would sell land at less than fair market value and retain an option to repurchase the property within one year for an increased price.  This type of transaction enabled Mr. Lords to obtain funds to be used to develop other sections of the tract and then exercise his option to buy back the initial partial using proceeds he earned from selling the now improved lots.

315. Ruggers had agreed to purchase land from Mr. Lords and give Mr. Lords an option to repurchase the property at an increased price within one year of closing.

316. The transaction which was proposed in the Ruggers matter was familiar to Kennedy Funding because that entity had been involved in a similar transaction with regards to other land owned by an entity controlled by David Lords.

317. Ruggers did not contact KENNEDY FUNDING to request a loan from that entity but rather a representative of KENNEDY FUNDING telephoned Christopher Sullivan – a representative of Ruggers – in the first instance and inquired as to whether Ruggers would like financing for the proposed transaction from KENNEDY FUNDING.

318.  Thereafter Ruggers, by and through its agents, had several telephone conversations with KENNEDY FUNDING and the Wolfer Defendants regarding the Kennedy Funding's participation in the loan transaction.

319.  During each and every conversation between the Ruggers and KENNEDY FUNDING's representatives, Ruggers was assured that any amounts forwarded to Kennedy Funding on behalf of Ruggers would be returned should the transaction not be consummated.

320.  KENNEDY FUNDING through JEFFREY WOLFER and Ruggers executed a "loan commitment" on or about October 10, 2006.

321.  Despite the fact that neither KENNEDY FUNDING nor its President and Co-CEO JEFFREY WOLFER had been provided with any contract evidencing the agreement between Ruggers and Laughlin Ranch, LLC they nonetheless executed the purported "loan commitment" on or about October 10, 2006.

322.  Ruggers and Laughlin Ranch, LLC executed their sales contract subsequent to the issuance of the purported "loan commitment".  The aforementioned sales contract was executed on or about October 11, 2006.

323.  Under the October 10, 2006 "loan commitment", KENNEDY FUNDING had agreed to extend a loan of $18,000,000.00 to Ruggers Acquisition and Development, LLC.

324.  The loan to Ruggers was not to exceed 50% of the market value of the subject property.

325.  The Ruggers' "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this

commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Five Hundred Forty Thousand Dollars ($540,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

326. The Ruggers' "loan commitment" states at page 4 in the first full paragraph that "[t]his letter will become a commitment once signed by all parties and returned with the Five Hundred Forty Thousand Dollars ($540,000) as outlined above."

327. The Ruggers' "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Five Hundred Forty Thousand Dollars ($540,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Five Hundred Forty Thousand Dollars ($540,000) in the following manner:

a.  One Hundred Eighty Thousand Dollars ($180,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than October 10, 2006, time of the essence;

b.  Three Hundred Sixty Thousand Dollars ($360,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing. In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

328. On or about October 10, 2006, Ruggers caused the sum of $180,000.00 to be wire transferred to the bank account of KENNEDY FUNDING as a partial payment of the advanced fee against the total commitment fee contemplated in the "loan commitment"

329. The $180,000.00 paid on behalf of Ruggers as referred to in the preceding paragraphs represented a partial payment of the advanced fee in the amount of $540,000.00 against the total commitment fee contemplated in the "loan commitment" as well as $10,000.00 representing Ruggers payment to the KENNEDY FUNDING for the preparation of the commitment letter.

330. In the event KENNEDY FUNDING elected not to proceed towards closing the $180,000.00 was to be returned to Ruggers.

331. In the event KENNEDY FUNDING was unable to perform its obligations under the letter commitment the $180,000.00 was to be returned to the Ruggers.

332. KENNEDY FUNDING and its representatives had ample time to consider the nature of the loan that Ruggers was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

333. KENNEDY FUNDING and its shareholders contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to Ruggers.

334. At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Ruggers Acquisition and Development, LLC that it had secured or

had attempted to secure funds from any person or entity which was to act as a participant in the funding of the loan principal.

335. The purpose of the Ruggers "loan commitment" was to ensure Ruggers that KENNEDY FUNDING had agreed to loan $18,000,000.00 to Ruggers Acquisition and Development, LLC, subject to the conditions set forth in that "loan commitment."

336. Another purpose of the lone commitment was to ensure Ruggers that KENNEDY FUNDING had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

337. At no time during the Ruggers transaction did KENNEDY FUNDING have the funds necessary to make the loan to Ruggers Acquisition and Development, LLC as contemplated by the "loan commitment" in their financial accounts.

338. At no time during the Ruggers transaction did KENNEDY FUNDING or the Wolfer defendants have the funds necessary to make the loan to Ruggers Acquisition and Development, LLC as contemplated by the "loan commitment" readily available to them.

339. If Ruggers knew that neither KENNEDY FUNDING nor the Wolfer Defendants had actually had the $18,000,000.00 in their accounts or readily available to them at the time the "loan commitment" agreement was presented to them they never would have entered into any agreement with KENNEDY FUNDING.

340. Subsequent to Ruggers executing the "loan commitment", KENNEDY FUNDING for the first time caused a document referred to as a "pre-closing checklist" to be forwarded to Ruggers.  That "pre-closing" checklist included approximately 67 items that were required to be addressed prior to any closing taking place.

341. Prior to entering into the "loan commitment" on October 10, 2006, with Ruggers, KENNEDY FUNDING knew that Ruggers was purchasing the property that was to act as collateral for the proposed loan for $15,000,000.00.

342. Prior to entering into the "loan commitment" on October 10, 2006, with Ruggers, KENNEDY FUNDING knew that the agreement between Rugger's and Laughlin Ranch, LLC was to contain a provision providing an option to Laughlin Ranch, LLC to repurchase the property from Rugger's within one year from the date of closing for approximately of $21,000,000.00.

343. The principal of Laughlin Ranch, LLC, a gentlemen by the name of David Lords, had previously been engaged in similar transactions commonly referred to as "land bank" transactions. In fact KENNEDY FUNDING had participated in such a transaction.

344. KENNEDY FUNDING was aware that David Lords was entering into such transactions as a means of raising capital that would enable him to continue to develop other sections of property his firms owned.

345. After Ruggers signed the "loan commitment" they proceeded to work diligently towards satisfying the conditions imposed in the "loan commitment" from KENNEDY FUNDING.

346. The Ruggers loan transaction was scheduled to be closed on October 20, 2006.

347. KENNEDY FUNDING and the Wolfer Defendants engaged the services of Volpe Real Estate Advisors, Inc. for the purposes of evaluating the property.

348. Volpe Real Estate Advisors, Inc. is an entity owned an operated by an individual by BERNARD VOLPE.

349. BERNARD VOLPE is not a licensed appraiser. VOLPE'S training is as an engineer.

350. BERNARD VOLPE has filed an affidavit in separate litigation on behalf of the KENNEDY FUNDING wherein he testifies that he is not an appraiser and does not hold himself out as such. (See *Kimball Management, LLC v. Kennedy Funding, Inc. et al.*, Docket Number 2:05-cv-70972, venued in the United States District Court for the Eastern District of Michigan, Document #6, filed on April 18, 2005).

351. BERNARD VOLPE is the individual that appraised the subject property for Volpe Real Estate Advisors, Inc.

352. KENNEDY FUNDING was aware that BERNARD VOLPE is the owner and operator of Volpe Real Estate Advisors, Inc. and further that BERNARD VOLPE is not a licensed appraiser.

353. Despite having the knowledge that VOLPE is not an appraiser and does not hold himself out as such both KENNEDY FUNDING in fact permitted VOLPE through his company, Volpe Real Estate Advisors, Inc., to complete the appraisal of the property that was to act as the collateral for the Ruggers loan which was the subject of the "loan commitment".

354. In the Ruggers matter, Volpe Real Estate Advisors, Inc. declared that the value of the property was $20,740,000.00.

355. In the Ruggers matter, just weeks prior to the subject property having been appraised by Volpe Real Estate Advisors, Inc., the parcel was appraised by an MAI certified appraiser from CB Richard Ellis.

356. CB Richard Ellis is a worldwide real estate corporation that is considered an expert in the field of appraising commercial real estate.

357. KENNEDY FUNDING has utilized the services of CB Richard Ellis for the purpose of appraising real property in other real estate loan transactions.

358. KENNEDY FUNDING considers CB Richard Ellis to be experts in the field of appraising commercial real estate.

359. The CB Richard Ellis appraisal provided to Ruggers stated that the subject parcel had a market value of $54,700,000.00.

360. In the Ruggers matter, by way of e-mail letter dated October 13, 2006, from Kevin Wolfer to Christopher Sullivan, KENNEDY FUNDING indicated that, as a result of the appraisal from Volpe Real Estate Advisors, Inc., they would only loan $10,370,000.00, to Ruggers Acquisition and Development, LLC.

361. Ruggers disputed the value of the collateral as determined by Volpe Real Estate Advisors, Inc. for KENNEDY FUNDING.

362. Thereafter Ruggers exercised their right under the "loan commitment" to have another evaluation of the property completed.

363. In the Ruggers matter, Despite the fact that the "loan commitment" required that the loan close no later than October 20, 2006, with time being declared "of the essence", KENNEDY FUNDING both failed to obtain the subsequent evaluation of property and also failed to close by the time of the essence deadline that they themselves insisted be included in the "loan commitment".

364. In the Ruggers matter, despite the fact that the explicit terms of the "loan commitment" provides that the agreement will not be binding until the entire advance fee is received and that the balance of such funds would not have been due until closing and further because it was KENNEDY FUNDING who failed and refused to

conduct a loan closing, KENNEDY FUNDING continued to refuse to return the funds paid on behalf of Ruggers.

365.    Ruggers and KENNEDY FUNDING never reached the point of closing on the purported "loan commitment."

366.    In Kennedy Funding, Inc. v. Ruggers Acquisition and Development, et al, Docket No.: 2:07-cv-669-FSH-PS and JM Realty & Investments v. KFI, et al, Docket No.: 2:07-218. JEFFREY WOLFER filed a certification on May 4, 2007.  In that certification JEFFREY WOLFER testified that KENNEDY FUNDING organizes its old files into two categories, "paid loans" and "dead files".  That company's record keeping system indicated that there were approximately 1,745 "dead files" but the actual number was most likely higher because they had not yet indexed their system.  However and nonetheless, of the "dead files" listed not all of those files represent transactions in which a "loan commitment" was entered into, an advance fee paid, a loan never closed but yet KENNEDY FUNDING nevertheless retained the advance fee.

367.    As further evidence that KENNEDY FUNDING never had any intention of loaning the $18,000,000.00 to Ruggers Acquisition and Development, LLC one must consider their failure to comply with the provisions of the Patriot Act codified at 31 U.S.C. §5311 *et seq.*

368.    KENNEDY FUNDING is a financial institution within the meaning of 31 U.S.C. §5312(a)(2) subparts (C), (P), (R), (U) and/or (Y).

369.    Upon execution of the "loan commitment" agreement on October 10, 2006, KENNEDY FUNDING was obligated pursuant to undertake certain due diligence and gather information concerning Ruggers for purposes of consummating the loan.

370. Part of this due diligence includes the requirement that KENNEDY FUNDING institute the appropriate Customer Identification Program (CIP) and other verification procedures.

371. Satisfaction of the due diligence portion of the Patriot Act is a labor-intensive procedure which ordinarily cannot be completed in less than two (2) to three (3) weeks.

372. The failure of KENNEDY FUNDING to perform the actions required of them by the Patriot Act is indicative of their pre-determined intent never to provide the agreed upon funding to Ruggers Acquisition and Development, LLC.

## Derenzy, Inc.

373. Another entity that had entered into a commercial real estate loan agreement with KENNEDY FUNDING was DeRenzy, Inc.

374. DeRenzy, Inc. was the name of a corporation that was to be formed by an individual named Graeme De Renzy for the purpose of securing a loan from KENNEDY FUNDING.

375. Graeme De Renzy is a citizen of the Republic of Ireland and has a principal place of business located at 11 Woodberry, Castleknock, Dublin 15, and the Republic of Ireland.

376. On or about October 22, 2004, Graeme De Renzy executed a document entitled "Letter of Interest". At approximately the same time he forwarded the sum of $10,000.00 to KENNEDY FUNDING. That document provided that the loan being requested from KENNEDY FUNDING was in the amount of $25,000,000.00.

377. Sometime after October 22, 2004, KENNEDY FUNDING began sending drafts of a loan commitment to Graeme De Renzy.

378. In what appears to be the third draft of the "loan commitment" issued on or about November 2, 2004, the loan amount was stated to be $25,000,000.00. That document was forwarded to Graeme De Renzy by GREGG WOLFER.

379. In yet another version of the "loan commitment" issue on or about November 8, 2004, the loan amount was stated to be $27,000,000.00.

380. In yet another version of the "loan commitment" issue on or about March 4, 2005, the loan amount was stated to be $39,200,000.00.

381. The "loan commitment" dated March 4, 2005, was executed on or about that same date by Graeme De Renzy and Jeffrey Wolfer on behalf of KENNEDY FUNDING.

382. By way of letter dated March 22, 2005, from Jeffrey Wolfer, the "loan commitment" was cancelled by KENNEDY FUNDING.

383. On or about April 1, 2005, Graeme De Renzy caused the amount of $139,000.00 to be paid via a wire transfer to KENNEDY FUNDING. Of that sum $10,000.00 was in payment of legal fees that were anticipated to be incurred by KENNEDY FUNDING and $129,000.00 was paid as part of the advance fee.

384. At a point in time subsequent to the initial $139,000.00 payment a second payment of $165,000.00 was paid via a wire transfer to KENNEDY FUNDING as an additional payment of the advanced fee required under the "loan commitment"

385. Under the "loan commitment" closing was to take place on March 30, 2005, time being said to be made of the essence. However, in a telephone conversation subsequent to the execution of the "loan commitment" but before the payment of the

advance fee it was agreed that closing would take place on April 6, 2005, time likewise being made of the essence.

386. On March 30, 2005, counsel for KENNEDY FUNDING for the first time provided counsel for Graeme De Renzy with a copy of its "draft preliminary closing checklist" which contained 42 items that needed to be completed in order to close on the subject loan.

387. On March 31, 2005, Michael Leighton, Esq., counsel for KENNEDY FUNDING in New Jersey spoke directly with Graeme De Renzy and inquired as to the names of attorneys in Ireland who could act as local counsel on behalf of KENNEDY FUNDING.  On that same date Graeme De Renzy sent an email message to Leighton and provided him with a the name of a local law firm known by him to be proficient and highly qualified in matters of Irish Conveyancing Law.

388. On April 12, 2005, both Leighton and Jeffrey Wolfer wrote emails to Graeme De Renzy complaining that KENNEDY FUNDING's Irish attorneys had not received any due diligence documents.  However, by way of letter dated April 13, 2005, the solicitors retained by KENNEDY FUNDING indicated that they had in fact received documents from Mr. De Renzy's solicitor.   Additionally, counsel for Graeme De Renzy had to send KENNEDY FUNDING's own draft preliminary closing checklist to their local solicitor as Leighton had not undertaken that most basic of tasks.

389. By way of letter sent via facsimile to Leighton on April 13, 2005, counsel for Graeme De Renzy provided responses to each of the 42 separate items contained within the KENNEDY FUNDING draft preliminary closing checklist.

390. Despite the fact that the closing had been agreed to close on April 6, 2005, KENNEDY FUNDING did not receive its appraisal of the value of the proposed collateral until on or about April 10, 2005.

391. The appraisal for KENNEDY FUNDING was completed by an individual by the name of BERNARD VOLPE. The person is not a licensed appraiser. His background essentially consists of having operated a design and construction company.

392. BERNARD VOLPE has filed an affidavit in separate litigation on behalf of the KENNEDY FUNDING DEFENDANTS wherein he testifies that he is not an appraiser and does not hold himself out as such. (See Kimball Management, LLC v. Kennedy Funding, Inc. et al., Docket Number 2:05-cv-70972, venued in the United States District Court for the Eastern District of Michigan, Document #6, filed on April 18, 2005).

393. In his April 13, 2005, counsel for KENNEDY FUNDING revealed that they were not going to "embark on a full investigation of the title to the subject property" until some 14 additional items of due diligence were provided to the satisfaction of KENNEDY FUNDING all in spite of the fact that the date for closing had passed.

394. On April 15, 2005, Jeffrey Wolfer wrote to Graeme De Renzy and informed him that Kennedy Funding would not loan him $39,200,000.00 but rather offered to loan only $21,125,000.00. It was on that same date that Wolfer for the first time provided a copy of the BERNARD VOLPE report to Graeme De Renzy.

395. At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Graeme De Renzy that it had secured funds from any person or entity which was to act as a participant in the funding of the loan principal.

396. In the April 15, 2005, letter from JEFFREY WOLFER, it is mentioned for the first time that Kennedy Funding was extending the loan closing to April 30, 2005, and that the time for closing was being made of the essence.

397. Thus, despite the fact that KENNEDY FUNDING did not close on the $39,200,000.00 loan by April 6, 2007, and despite the fact that KENNEDY FUNDING had failed to provide any alternative loan offer by that same date which in turn would have triggered its obligation to return the advance fees it had received, KENNEDY FUNDING thereafter unilaterally attempted to change the terms of the loan so that the closing date would occur at a point in time after it had made a new loan offer in supposed compliance with the "loan commitment".

398. Thereafter, following Graeme De Renzy's having raised concerns over the evaluation performed by Volpe, JEFFREY WOLFER once again extended the "loan commitment" to May 20, 2005.

399. By way of letter dated May 4, 2005, Jeffrey Wolfer wrote to Graeme De Renzy once again reiterating that KENNEDY FUNDING would not make a loan of $39,200,000.00 but only $21,125,000.00.

400. Kennedy Funding never made a loan to Graeme De Renzy and never refunded any of the advanced fees paid by Graeme De Renzy to KENNEDY FUNDING.

**Construcciones Haus Sociedad Anonima De Capital Variable**

401. Another entity that had entered into a commercial real estate loan agreement with KENNEDY FUNDING was an entity known as CONSTRUCCIONES HAUS SOCIEDAD ANONIMA DE CAPITAL VARIABLE (A Corporation organized under the laws of the Country of Mexico) (hereinafter referred to as "Constructiones Haus")

402. The purpose of the loan that Constructiones Haus sought from Kennedy Funding was to allow Constructiones Haus to purchase and develop a certain tract of land in the municipality of Xochitepec in the State of Morelos, Country of Mexico.

403. In or about December 2005, Constructiones Haus began negotiating a loan agreement with KENNEDY FUNDING.

404. Constructiones Haus exchanged emails with the Kennedy Funding and the Wolfer Defendants regarding the terms of the "loan commitment."

405. Constructiones Haus had several telephone conversations with the KENNEDY FUNDING DEFENDANTS regarding the terms of the "loan commitment."

406. During each and every communication between Constructiones Haus and Kennedy Funding, Kennedy Funding assured Constructiones Haus that any amounts forwarded to the Kennedy Funding would be returned should the transaction not be consummated.

407. Several drafts of the "loan commitment" were sent between Constructiones Haus and Kennedy Funding.

408. The final draft of the "loan commitment" was executed on or about February 16, 2006.

409.  Kennedy Funding refused to provide a copy of the "loan commitment", executed by themselves, despite having been asked to do so on several occasions.

410.  Constructiones Haus never received a copy of the commitment letter purportedly executed by Kennedy Funding.

411.  The Constructiones Haus "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the borrower, accompanied with the commitment fee in the amount of Two Hundred Thirty Thousand Dollars ($230,000) which is non-refundable (accept as agreed to herein) and earned for, among other things, the commitment to provide funds."

412.  The Constructiones Haus "loan commitment" states at page 5 in the second paragraph that "[t]his letter will become a commitment once signed by all parties and returned with the Two Hundred Thirty Thousand Dollars ($230,000) as outlined above."

413.  The Constructiones Haus "loan commitment" states at page 7 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Two Hundred Thirty Thousand Dollars ($230,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the two hundred thirty thousand dollars ($230,000) in the following manner:

    a.      One Hundred Thirty Thousand Dollars ($120,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than February 17, 2006, <u>time of the essence</u>;

    b.      One Hundred Ten Thousand Dollars ($110,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI.

414.    Under the February 16, 2006 "loan commitment", KENNEDY FUNDING had agreed to extend a loan of $8,000,000.00 to Constructiones Haus.

415.    On or about February 16, 2006, Constructiones Haus sent $130,000.00 to KENNEDY FUNDING.

416.    The $130,000.00 payment referred to in the preceding paragraph represented a partial payment of the advanced fee in the amount of $120,000.00 against the total commitment fee contemplated in the "loan commitment" as well as $10,000.00 representing the Constructiones Haus' payment to KENNEDY FUNDING for the preparation of the commitment letter.

417.    In the event KENNEDY FUNDING elected not to proceed towards closing the $120,000.00 was to be returned to Constructiones Haus.

418.    In the event KENNEDY FUNDING was unable to perform its obligations under the letter commitment the $120,000.00 was to be returned to Constructiones Haus.

419.   Constructiones Haus was further obligated to pay KENNEDY FUNDING's counsel fees relative to the subject transaction.

420.   After Constructiones Haus signed the "loan commitment" they proceeded to work diligently towards satisfying the conditions set forth in the "loan commitment" from KENNEDY FUNDING.

421.   The Constructiones Haus loan transaction was scheduled to be closed on or before March 21, 2006.

422.   Constructiones Haus and KENNEDY FUNDING never reached the point of closing on the purported "loan commitment".

423.   At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Constructiones Haus that it had secured funds from any person or entity which was to act as a participant in the funding of the loan principal.

424.   The "loan commitment" letter issued by KENNEDY FUNDING provided that KENNEDY FUNDING was to loan 60% of the "as completed" disposition value of the collateral to Constructiones Haus.

425.   Disposition value is defined by KENNEDY FUNDING as a three to four month sale to a cash buyer.

426.   The "loan commitment" issued by KENNEDY FUNDING stated that they would "retain Cushman & Wakefield, CB Richard Ellis or the equivalent to inspect the Collateral and, determine both the 'as is' and 'as completed' value of the Collateral…"

427. However, Kennedy Funding to "retain Cushman & Wakefield, CB Richard Ellis or the equivalent to inspect the Collateral and, determine both the 'as is' and 'as completed' value of the Collateral…"

428. KENNEDY FUNDING retained Specialty Real Estate Advisors, LTD. to appraise the property.

429. Specialty Real Estate Advisors, LTD. is an entity owned and operated by Bernard Volpe.

430. BERNARD VOLPE is the individual that evaluated the subject property for Specialty Real Estate Advisors, LTD.

431. BERNARD VOLPE is not a licensed appraiser.  Bernard Volpe's training is as an engineer.

432.  KENNEDY FUNDING and the Wolfer Defendants were aware that Bernard Volpe is the owner and operator of Specialty Real Estate Advisors, LTD.

433. KENNEDY FUNDING was aware that Bernard Volpe is not a licensed appraiser.

434. KENNEDY FUNDING was aware that Bernard Volpe is not an appraiser and does not hold himself out as such.

435. Despite having the knowledge that BERNARD VOLPE is not an appraiser and does not hold himself out as such and further that the "loan commitment" in the Constructiones Haus matter obligated KENNEDY FUNDING to "retain Cushman & Wakefield, CB Richard Ellis or the equivalent to inspect the Collateral and, determine both the 'as is' and 'as completed' value of the Collateral…", KENNEDY FUNDING in fact permitted BERNARD VOLPE through his company Specialty Real Estate

Advisors, LTD, to complete the appraisal of the property that was to act as the collateral for the loan which was the subject of the "loan commitment".

436. Specialty Real Estate Advisors, LTD. determined that the "as is" market value of the land was $3,000,000.00.

437. Specialty Real Estate Advisors, LTD. then determined that a 30% discount should be applied to determine the disposition value of the property.

438. No explanation was given to substantiate the 30% discount.

439. After applying the 30% discount, Specialty Real Estate Advisors, LTD. determined that the "as is" disposition value of property was $2,100,000.00.

440. Specialty Real Estate Advisors, LTD. thereafter determined that the "as completed" market value of the entire project was $11,573, 569.00.

441. Specialty Real Estate Advisors, LTD. then determined that "any potential buyer of the project at that stage would want a discount…" and determined that again a 30% discount should be applied to the "as completed" market value to determine the disposition value of the property.

442. No explanation was given to substantiate the 30% discount.

443. When applying the 30% discount, Specialty Real Estate Advisors, LTD. determined that the "as completed" disposition value of property was $8,101,500.00.

444. Ultimately, and based upon the appraisal provided by Specialty Real Estate Advisors, LTD., KENNEDY FUNDING refused to loan the $8,000,000.00 to Constructiones Haus.

445. KENNEDY FUNDING and the Wolfer Defendants have also refused to refund the $120,000.00 which was forwarded to them by Constructiones Haus.

**Royale Luau Resort, LLC**

446. Another entity that had entered into a commercial real estate loan agreement with KENNEDY FUNDING was Royale Luau Resort, LLC (hereinafter referred to as "Royale Luau")

447. Royale Luau was involved in a commercial real estate transaction that involved the proposed purchase and re-development of a certain tract of land in Panama City, Florida.

448. In or about March, 2005, Royale Luau became aware of KENNEDY FUNDING, and sought to enter into a commercial loan transaction with Kennedy Funding.

449. Royale Luau, by and through its agents, had several telephone conversations with the KENNEDY FUNDING and the Wolfer Defendants regarding Royale Luau's proposed loan transaction.

450. During each and every conversation between Royale Luau and KENNEDY FUNDING and/or the Wolfer Defendants, Royale Luau was assured that any monies forwarded to KENNEDY FUNDING by Royale Luau would be returned should the transaction not be consummated.

451. Royale Luau executed a document referred to as a "loan commitment" with KENNEDY FUNDING on or about April 8, 2005.

452. KENNEDY FUNDING allegedly executed a document referred to as a "loan commitment" with Royale Luau on or about April 8, 2005.

453. KENNEDY FUNDING failed to provide a fully executed copy of the "loan commitment" to Royale Luau until April 11, 2005.

454.    KENNEDY FUNDING charged Royale Luau twenty five thousand dollars ($25,000.00) for the preparation of the "loan commitment".

455.    Under the section entitled "AMOUNT OF LOAN" contained on page one of the Royale Luau "loan commitment", it states: "A loan of Ninety Two Million Dollars ($92,000,000.00) including the FEE, fees and costs in accordance with Schedule A attached."

456.    Prior to entering into the "loan commitment" on April 8, 2005, KENNEDY FUNDING did not know the address, acreage and zoning of the real property that was to act as the collateral in the subject transaction.

457.    Despite not having basic information such as the address, acreage and zoning of the real property that was to act as the collateral in the subject transaction, KENNEDY FUNDING nonetheless entered into a "loan commitment" with Royale Luau to make a loan for $92,000,000.00.

458.    The loan transaction was scheduled to be closed on April 19, 2005.

459.    At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the Royale Luau that it had secured funds or attempted to secure funds from any person or entity which was to act as a participant in the funding of the loan principal.

460.    On April 11, 2005, JEFFREY WOLFER wrote to Royale Luau and advised that "[w]e have still not received the collateral description to attach to the loan commitment as Schedule "C". The lack of an accurate description of the property (acreage, address, zoning) is precluding us from commencing the appraisal of the property."

461. Under the section entitled "ACCEPTANCE OF COMMITMENT" contained on page three of the Royale Luau "loan commitment", it states: "In accordance with the agreement by and between the parties, Borrower and Lender agree that the purpose of this Loan is to provide funds for improvements to the Collateral and that the basis of this Loan is the *market value* of the real estate Collateral *as completed* by KFI Loan proceeds." [emphasis added]

462. Under the section entitled "ACCEPTANCE OF COMMITMENT" contained on page three of the Royale Luau "loan commitment", it states: "Market value is defined as a three (3) to four (4) month sale to a cash buyer."

463. The definition of "Market Value" contained with the Royale Luau "loan commitment" is incorrect.

464. A three (3) to four (4) month sale to a cash buyer is the definition of "disposition value" of a certain parcel of real property.

465. The real property that was to be the collateral for the subject loan in this matter was never intended to be appraised at "disposition value" for the purposes of calculating the amount of the loan to be made by KENNEDY FUNDING to Royale Luau.

466. KENNEDY FUNDING retained Cushman & Wakefield to complete an appraisal of the subject property. In the appraisal report completed by that company which is dated both April 13, 2005 and April 18, 2005, "market value" is defined as

> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.      Buyer and seller are typically motivated;
2.      Both parties are well informed or well advised, and acting in what they consider their own best interests;
3.      A reasonable time is allowed for exposure in the open market;
4.      Payment is made in terms of cash in US dollars or in terms of financial arrangement comparable thereto; and
5.      The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

467.    The Royale Luau "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Two Million Seven Hundred Sixty Dollars ($2,760,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

468.    The Royale Luau "loan commitment" states at page 4 in the fourth paragraph that "[t]his letter will become a commitment once signed by all parties and returned with the Two Million Seven Hundred Sixty Dollars ($2,760,000) as outlined above."

469.    The Royale Luau "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Two Million Seven Hundred Sixty Dollars ($2,760,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all rights to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Two Million Seven Hundred Sixty Dollars ($2,760,000) in the following manner:

    a.      Five Hundred Thousand Dollars ($500,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than April 8, 2005, <u>time of the essence</u>;

    b.      Two Million Two Hundred Sixty Dollars ($2,260,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

470.    On or about April 8, 2005, Royale Luau wired $525,000.00 to KENNEDY FUNDING. representing a partial payment of $500,000.00 of the advanced fee against the total commitment fee contemplated in the "loan commitment" and $25,000.00 representing the fee charged by KENNEDY FUNDING for the preparation of the "loan commitment".

471.    In the event KENNEDY FUNDING elected not to proceed towards closing the $525,000.00 was to be returned to Royale Luau.

472.    In the event KENNEDY FUNDING was unable to perform its obligations under the letter commitment the $525,000.00 was to be returned to Royale Luau.

473.    Royale Luau and KENNEDY FUNDING never closed on the subject loan.

474.    Prior to entering into the "loan commitment" KENNEDY FUNDING had ample time to consider the nature of the loan that Royale Luau was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

475. KENNEDY FUNDING and the Wolfer Defendants contend that they are experts in the area of commercial real estate lending and as such are aware of the time generally required to complete tasks associated with conditions to a loan commitment such as the conditions that they had included in the ultimate "loan commitment" which they issued to Royale Luau.

476. KENNEDY FUNDING issued a document in the loan transaction that they were involved in with Royale Luau which they termed a "loan commitment".

477. Among the purposes of the aforementioned "loan commitment" was to ensure Royale Luau that KENNEDY FUNDING had agreed to loan $92,000,000.00 to Royale Luau, subject to the conditions set forth in that "loan commitment".

478. Another purpose of the loan commitment was to ensure Royale Luau that KENNEDY FUNDING had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

479. At no time during the Royale Luau transaction did either KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to Royale Luau as contemplated by the "loan commitment" in their financial accounts.

480. At no time during the Royale Luau transaction did either KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to Royale Luau as contemplated by the "loan commitment" readily available to them.

481. If Royale Luau knew that KENNEDY FUNDING did not actually have the $92,000,000.00 in their accounts or readily available to them at the time the "loan commitment" agreement was presented to it, they never would have entered into any agreement with Kennedy Funding.

482. After Royale Luau's representatives signed the "loan commitment" they proceeded to work diligently towards satisfying the conditions imposed in the "loan commitment" from KENNEDY FUNDING.

483. The parties to the "loan commitment" agreed that the loan would be based upon the "as completed" market value of the proposed project to be completed at the subject real property.

484. KENNEDY FUNDING insisted that the "loan commitment" include provisions providing that the time within which to close the subject loan transaction was "time of the essence".

485. Despite being experts in the field of commercial real estate lending, KENNEDY FUNDING nonetheless presented a document which they term a "loan commitment" to Royale Luau purporting to obligate KENNEDY FUNDING to loan $92,000,000.00 to Royale Luau without KENNEDY FUNDING ever having seen the subject property, known the precise address of the subject property, known the acreage of the subject property, known the local zoning laws applicable to the subject property or having conducted an appraisal of the subject property.

486. Despite not having conducted any of its own due diligence on a purported agreement to loan $92,000,000.00 for the purchase of real property located in Florida along the Gulf of Mexico and the construction of a 22 story, 495 unit condominium building with a seven story parking deck and street level retail shops, KENNEDY FUNDING nonetheless allegedly signed the "loan commitment" on April 8, 2005, and made "time of the essence" for closing with a closing date set for April 19, 2005.

487. Despite having agreed in the "loan commitment" that the property that was to act as the collateral in the subject transaction was to be valued in an "as completed" fashion, KENNEDY FUNDING instructed their appraiser from Cushman & Wakefield to provide a "market value and disposition value estimates" of the real property.

488. The appraisal, which was provided by Cushman & Wakefield to KENNEDY FUNDING on either on April 13, 2005 or April 18, 2005, declared that the "market value" of the property was $29,700,000.00.

489. This appraisal was not an "as completed" appraisal but rather it was an "as intended" appraisal.

490. An "as intended" appraisal values the property as if all approvals and plans for development were in place and construction can begin on the project.

491. The appraisal specifically states that "[a]s a hypothetical condition, we have valued the property as though it could be developed with 495 units."

492. The appraisal does not state that the appraisers evaluated the property as if the development had been completed.

493. After determining the "as is" market value of the subject property Cushman & Wakefield declared that a discount of 40% off of the market value could be expected for the purposes of determining "disposition value."

494. Using this formula, Cushman &Wakefield thus determined that the "disposition value" of the property was $17,800,000.00.

495. Royale Luau disputes the value of the collateral as determined by Kennedy Funding.

496. KENNEDY FUNDING was aware that Royale Luau was under contract to purchase the subject property for approximately $32,000,000.00.

497.  KENNEDY FUNDING was further aware that any loan, based upon an appraisal of $17,800,000.00, would not be sufficient to allow Royale Luau to purchase the subject property, let alone re-develop the same.

498.  In their appraisal, Cushman &Wakefield stated that, when determining disposition value, "there is a great degree of subjectivity and judgment involved in this estimate, as there is no scientific method, or 'rule of thumb' regarding such a value estimate."

499.  The appraisal further stated that "we have relied on discussions with regional brokers and appraisers who have been involved in sales with highly motivated sellers. Although no specific examples were discussed, they were generally of the opinion that a discount ranging from 35 to 45 percent of the market value would be most likely under a disposition value scenario."

500.  The identities brokers and appraisers who provided the opinions upon which Cushman & Wakefield said to have relied upon are not disclosed.

501.  Subsequent to receiving the appraisal from Cushman &Wakefield, KENNEDY FUNDING contacted Royale Luau by way of telephone on April 19, 2005 (the original closing date) and stated that Cushman &Wakefield could not determine the "as completed" value of the property because finalized architectural drawings had not been completed.

502.  During that conversation and with knowledge that the previously obtained appraisal was not sufficient to allow Royale Luau to even purchase the subject property let alone fund the proposed construction, KENNEDY FUNDING informed Royale Luau that Royale Luau should request an amendment to the "loan commitment" to allow

for an "as entitled" appraisal as opposed to the originally agreed upon "as completed" appraisal.

503. Pursuant to KENNEDY FUNDING's instructions and advise, Royale Luau requested the aforementioned amendment to the "loan commitment" on April 20, 2005 which was granted by KENNEDY FUNDING by way of a countersigned letter executed by Joseph Wolfer on that same date.

504. There was also an amendment request dated April 19, 2005 to change the closing date to April 29, 2005 which was also granted by KENNEDY FUNDING by way of a countersigned letter executed by Joseph Wolfer on that same date.

505. Royale Luau was not aware of the Cushman & Wakefield appraisal prior to requesting the change in valuation methods.

506. Had Royale Luau known that KENNEDY FUNDING had already obtained an "as entitled" appraisal and that the value was far below even the contract price for the property, Royale Luau never would have agreed to amend the "loan commitment" to change the valuation method.

507. KENNEDY FUNDING did not provide the previously obtained appraisal until sometime after April 22, 2005.

508. Upon receipt of the appraisal Royale Luau's representatives contacted Cushman & Wakefield to discuss the appraisal and its many inaccuracies.

509. The appraiser who completed the appraisal informed Royale Luau's representatives that he would not speak with them and that he was only authorized to speak to the representatives of KENNEDY FUNDING.

510. Thereafter Royale Luau sent correspondence to Kennedy Funding and Cushman & Wakefield contesting the appraisal.

511. In that correspondence Royale Luau demonstrated that the appraisal contained many inaccuracies and that the comparable properties that the appraiser utilized were not all comparable to the subject property and several were too old to be considered accurate.

512. Neither KENNEDY FUNDING nor Cushman & Wakefield took any steps to rectify the inaccuracies in the appraisal.

513. Despite the fact that KENNEDY FUNDING's own real estate appraisal experts have stated that there exists no reasonably objective basis upon which to determine the "disposition" value of the property which was to act as the collateral in the subject loan, KENNEDY FUNDING nonetheless unilaterally amended the "loan commitment" to reflect a loan amount of 60% of the disposition value of the property as determined by Cushman & Wakefield.

514. Ultimately KENNEDY FUNDING made a "loan offer" to Royale Luau of approximately $10,000,000.00 which was approximately $22,000,000.00 less than the contract price for the subject property and $82,000,000.00 less than the amount agreed to in the "loan commitment"

515. KENNEDY FUNDING forwarded the "preliminary closing checklist" to Royale Luau for the first time on April 18, 2005, the day prior to the original closing date.

516. The "preliminary closing checklist" placed requirements on Royale Luau that were not stated in the commitment letter.

517. Despite the fact that the explicit terms of the "loan commitment" provide that the agreement will not be binding until the entire advance fee is received and that the balance of such funds would not have been due until closing and further despite the fact that it was KENNEDY FUNDING who failed and refused to conduct a loan closing, Kennedy Funding continues to refuse to return Royale Luau's funds.

### Omni Credit Alliance, INC.

518. Another entity that had entered into a commercial real estate loan agreement with KENNEDY FUNDING was Omni Credit Alliance, Inc.

519. The Omni Credit Alliance, Inc. matter was tried to the court in September 2007 and a written opinion was entered by the trial judge in December 2007.

520. Omni Credit Alliance, Inc. intended to borrow money from KENNEDY FUNDING for what it purported to be business purposes.

521. Omni Credit Alliance, Inc. sought to borrow a total of approximately $25,000,000.00 from KENNEDY FUNDING.

522. Omni Credit Alliance, Inc. communicated mostly with JEFFREY WOLFER, who is an officer in Kennedy Funding.

523. On or about November 14, 2002, KENNEDY FUNDING issued a "loan commitment" to Omni Credit Alliance, Inc.

524. That "loan commitment" was executed by JEFFREY WOLFER on behalf of KENNEDY FUNDING.

525. The loan that was to be made from KENNEDY FUNDING to Omni Credit Alliance, Inc. was to close on December 6, 2002.

526. At approximately the same time (11/14/02) Omni Credit Alliance, Inc. provided KENNEDY FUNDING with $260,000.00 as an advanced fee.

527. That sum represented the $250,000.00 commitment fee demanded by Kennedy Funding as well as $10,000.00 for the preparation of the commitment letter.

528. In the event KENNEDY FUNDING, elected not to proceed towards closing the $260,000.00 was to be returned to Omni Credit Alliance, Inc.

529. In the event KENNEDY FUNDING was unable to perform its obligations under the "loan commitment: the $260,000.00 was to be returned to Omni Credit Alliance, Inc.

530. The collateral that was to be offered by Omni Credit Alliance, Inc. was a guarantee from a company with a Best rating of A-, X or better of a Standard & Poor's rating of A or better.

531. Omni Credit Alliance, Inc. was prepared to offer as collateral to KENNEDY FUNDING Zero Coupon United States Treasury Strips.

532. The face value of the strips on the date of closing would have been $25,000,000.00.

533. This collateral is AAA rated by Standard and Poor's and insured by the Federal Government.

534. JEFFREY WOLFER acknowledged the AAA rating of this collateral during the trial in the litigation initiated by Omni Credit Alliance, Inc. against KENNEDY FUNDING.

535. Ultimately KENNEDY FUNDING failed and refused to close the loan with Omni Credit Alliance, Inc. and refused to return the $250,000.00 commitment fee.

536. KENNEDY FUNDING did not have the loan funds in its accounts on the date the Omni Credit Alliance, Inc. loan was to close.

537. KENNEDY FUNDING did not have the loan funds readily available to it on the date the Omni Credit Alliance, Inc. loan was to close.

538. KENNEDY FUNDING never intended to close the loan with Omni Credit Alliance, Inc.

539. KENNEDY FUNDING commitment letter issued to Omni Credit Alliance, Inc. was fraudulent.

540. As in the current matter, KENNEDY FUNDING and the Wolfer Defendants failed to conduct any Patriot Act Compliance as was their duty.

541. After a two day trial in the litigation brought by Omni Credit Alliance, Inc. against KENNEDY FUNDING the Hon. Peter G. Sheridan, U.S.D.J. specifically found that KENNEDY FUNDING had breached the Covenant of Good Faith and Fair Dealing with respect to its dealings with Omni Credit Alliance, Inc.

542. Further, Judge Sheridan found that, once KENNEDY FUNDING received the advanced fee from Omni Credit Alliance, Inc., Kennedy Funding was limited to deflecting Omni's collateral proposals and rejecting them with little explanation."

543. Further, Judge Sheridan found that "[t]he record is void of any evidence that Kennedy undertook any measures to close the loan."

### JM Realty & Investments, LLC

544. Another entity that had entered into a commercial real estate loan agreement with KENNEDY FUNDING was JM Realty & Investments, LLC.

545. JM Realty & Investments, LLC is a Wisconsin Limited Liability Company with its principle place of business located at 411 Westfield Way, Pewaukee, WI 53072.

546.    JM Realty & Investments, LLC became a creditor of an entity known J&M Development.  While the names of the two companies are similar, the similarity of the two entities names in merely a coincidence.

547.    Upon Information and belief, J&M Development negotiated a loan commitment with Kennedy Funding and the Wolfer Defendants, but lacked the funds to forward the advanced fees demanded by Kennedy Funding and the Wolfer Defendants.

548.    In or about May, 2005, J&M Development as well as Kennedy Funding and the Wolfer Defendants requested that JM Realty & Investments, LLC become involved in the transaction.

549.    JM Realty & Investments, LLC, by and through its agents, had several telephone conversations with Kennedy Funding and the Wolfer Defendants regarding JM Realty & Investments, LLC's participation in the loan transaction.

550.    During each and every conversation between JM Realty & Investments, LLC and Kennedy Funding and the Wolfer Defendants, Kennedy Funding and the Wolfer Defendants assured JM Realty & Investments, LLC that any amounts forwarded to Kennedy Funding and the Wolfer Defendants by JM Realty & Investments, LLC would be returned should the transaction not be consummated.

551.    Upon information and belief, Kennedy Funding and the Wolfer Defendants and J&M Development executed a  "loan commitment" on or about June 1, 2005.

552.    Under the June 1, 2005 "loan commitment", Kennedy Funding and the Wolfer Defendants had agreed to extend a loan of $12,000,000.00 to J&M Development.

553.    At no time did KENNEDY FUNDING or the Wolfer Defendants provide any information to the J&M Realty that it had secured funds or attempted to secure funds

from any person or entity which was to act as a participant in the funding of the loan principal.

554.    The loan was not to exceed 60% of the disposition value of the project.

555.    The "loan commitment" states at page 3 in the section entitled "Acceptance of Commitment" that "[t]he commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment, duly accepted by the Borrower, accompanied with the commitment fee in the amount of Three Hundred Sixty Dollars ($360,000) which is non-refundable and earned for, among other things, the commitment to provide funds."

556.    The "loan commitment" states at page 4 in the fourth paragraph that "[t]his letter will become a commitment once signed by all parties and returned with the Three Hundred Sixty Dollars ($360,000) as outlined above."

557.    The "loan commitment" states at page 6 in the section entitled "Commitment Fee Modification" that "[n]otwithstanding the above requirement to pay Three Hundred Sixty Dollars ($360,000) at the signing of the commitment, as consideration for the parties unconditionally and irrevocably waiving all right to trial by jury and the parties agreeing to the Choice of Forum and Liquidation of Damages clauses, KFI will accept payment of the Three Hundred Sixty Dollars ($360,000) in the following manner:

   a.    Seventy Thousand Dollars ($70,000) to be paid at the time this commitment is signed, prior to our due diligence, which signing will be no later than June 2, 2005, time of the essence;

b.  One Hundred Ten Thousand Dollars ($110,000) to be paid no later than June 7, 2005, time of the essence;

c.  One Hundred Eighty Thousand Dollars ($180,000) to be paid at the closing or upon Borrower electing not to proceed to a Loan closing.  In addition, any default by the Borrower under this commitment, or other failure of Borrower to comply with this commitment, or misrepresentation by Borrower of any fact or state of facts to KFI either in connection with this commitment or otherwise, or any material adverse change of any type shall not relieve Borrower of its obligation to pay such amount to KFI."

558.  J&M Development and KENNEDY FUNDING and the Wolfer Defendants never reached the point of closing on the purported "loan commitment."

559.  On or about June 1, 2005, JM Realty & Investments, LLC wired $70,000.00 to Kennedy Funding as a partial payment of the advanced fee against the total commitment fee contemplated in the "loan commitment"

560.  On or about June 7, 2005, JM Realty & Investments, LLC sent an additional $120,000.00 to Kennedy Funding as payment of the advanced fee against the total commitment fee contemplated in the loan commitment.

561.  The $190,000.00 payment referred to in the preceding paragraphs represented a partial payment of the advanced fee in the amount of $180,000.00 against the total commitment fee contemplated in the "loan commitment" as well as $10,000.00 representing JM Realty & Investments, LLC's payment to KENNEDY FUNDING and the Wolfer Defendants for the preparation of the commitment letter.

562.  In the event KENNEDY FUNDING elected not to proceed towards closing the $190,000.00 was to be returned to JM Realty & Investments, LLC.

563.  In the event KENNEDY FUNDING was unable to perform its obligations under the "loan commitment: the $190,000.00 was to be returned to JM Realty & Investments, LLC.

564.  KENNEDY FUNDING and the Wolfer Defendants had ample time to consider the nature of the loan that J&M Development was seeking including the collateral, against which there was to be a lien assuring payment of said loan.

565.  KENNEDY FUNDING and the Wolfer Defendants issued a document in the loan transaction that they were involved in with JM Realty & Investments, LLC and J&M Development, which they termed a "loan commitment".

566.  The purpose of the aforementioned "loan commitment" was to ensure the Plaintiff and J&M Development that KENNEDY FUNDING and the Wolfer Defendants had agreed to loan $12,000,000.00 to J&M Development, subject to the conditions set forth in that "loan commitment."

567.  Another purpose of the lone commitment was to ensure J&M Development that KENNEDY FUNDING and the Wolfer Defendants had the loan funds in their accounts or readily available to them to make the loan in the amount that had been agreed to.

568.  At no time during the transaction did either KENNEDY FUNDING or the Wolfer Defendants have the funds necessary to make the loan to J&M Development as contemplated by the "loan commitment" in their financial accounts.

569.    At no time during the transaction did either Kennedy Funding or the Wolfer Defendants have the funds necessary to make the loan to J&M Development as contemplated by the "loan commitment" readily available to them.

570.    The loan transaction was scheduled to be closed on June 17, 2005.

571.    The "loan commitment" was extended once to allow for a June 24, 2005 closing date as a result of the appraisal of the premises being delayed.

572.    Upon Information and belief the "loan commitment" was extended a second time to allow for a June 30, 2005 closing date.

573.    KENNEDY FUNDING forwarded the "preliminary closing checklist" to J&M Development for the first time on June 16, 2005, which was the day prior to the original closing date.

574.    The "preliminary closing checklist" placed requirements on J&M Development that were not stated in the commitment letter.

575.    The "loan commitment" issued by Kennedy Funding to J&M Development provided that the Kennedy Funding was to loan 60% of the "as completed" disposition value of the premises to J&M Development.

576.    Disposition value is defined as a three to four month sale to a cash buyer.

577.    KENNEDY FUNDING engaged the services of an entity known as "Cushman & Wakefield" for the purposes of appraising the subject property.

578.    Cushman & Wakefield declared that the "as is" market value of the property was $1,130,000.00.

579.    Cushman & Wakefield declared that a discount of 25% off of the market value could be expected for the purposes of determining "disposition value".

580. Using this formula, Cushman &Wakefield thus determined that the "as is disposition value" of the property was $850,000.00.

581. Furthermore, Cushman & Wakefield then determined that the "as completed market value" of the property was $16,400,000.00.

582. Thereafter, Cushman &Wakefield then determined that the "as completed disposition value" of the property was $12,300,000.00.

583. In their appraisal, Cushman &Wakefield stated that, when determining disposition value, "there is a great degree of subjectivity and judgment involved in this estimate, as there is no scientific method, or 'rule of thumb' regarding such a value estimate."

584. The appraisal further stated that "we have relied on discussions with regional brokers and appraisers who have been involved in sales with highly motivated sellers. Although no specific examples were discussed."

585. The identities brokers and appraisers who provided the opinions upon which Cushman & Wakefield rely are not disclosed.

586. By way of email dated July 22, 2005, Matthew Cole – a Vice President of KENNEDY FUNDING – wrote to JM Realty & Investments, LLC that "[o]ur obligation is to evaluate the collateral and offer a loan based upon the value of the collateral."

587. Despite the fact that KENNEDY FUNDING's own real estate appraisal experts have stated that there exists no reasonably objective basis upon which to determine the "disposition" value of the property which was to act as the collateral in the subject loan, Kennedy Funding and the Wolfer Defendants nonetheless unilaterally amended the "loan commitment".

588. JM Realty & Investments, LLC disputes the value of the collateral as determined by Kennedy Funding and the Wolfer Defendants.

589. Despite the fact that the explicit terms of the "loan commitment" provides that the agreement will not be binding until the entire advance fee is received and that the balance of such funds would not have been due until closing and further because it was Kennedy Funding and the Wolfer Defendants who failed and refused to conduct a loan closing, Kennedy Funding and the Wolfer Defendants continue to refuse to return JM Realty & Investments, LLC's funds.

590. The above matters are all examples of the example of the pattern and practice racketeering activity by Kennedy Funding and the Wolfer Defendants.

## COUNT ONE

## (Racketeer Influenced Corrupt Organization Act)

591. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

592. In the State of New Jersey the Racketeer Influenced Corrupt Organization Act (hereinafter referred to as "RICO") is codified at N.J.S.A. 2C:41-1 *et seq.*

593. Jeffrey Wolfer has received income derived directly and/or indirectly from a pattern of racketeering activity.

594. Kevin Wolfer has received income derived directly and/or indirectly from a pattern of racketeering activity.

595. Gregg Wolfer has received income derived directly and/or indirectly from a pattern of racketeering activity.

596.   Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer operate Kennedy Funding, Inc. for the purposes of defrauding potential borrowers.

597.   Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer are engaged in a RICO enterprise whereby they defraud potential borrowers out of advanced fees paid to Kennedy Funding, Inc.

598.   Because Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer are engaged in trade and/or commerce within the meaning of N.J.S.A. 2C:41-2(a), and further because the activities of Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer affect trade and/or commerce within the meaning of N.J.S.A. 2C:41-2(a) they are subject to New Jersey's RICO Statute.

599.   Likewise, Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer have used and/or invested a part of the income which they have derived directly and/or indirectly from a pattern of racketeering activity in the acquisition of an interest in, or the establishment or operation of an enterprise which is engaged in or the activities of which affect trade or commerce.

600.   N.J.S.A. 2C:21-4 "Falsifying or tampering with records" provides in pertinent that ". . . a person commits a crime . . . if he . . . utters any writing or record knowing that it contains a false statement or information, with the purpose to deceive or injure anyone or to conceal any wrongdoing."

601.   In this matter Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer issued a "loan commitment" through Kennedy Funding, Inc. concerning a loan they claimed to be ready and willing and able to make to the Plaintiff.

602. The aforementioned loan commitment was executed by Kevin Wolfer on behalf of Kennedy Funding, Inc.

603. At the time Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer issued and/or uttered the "loan commitment" to the Plaintiff they knew they contained a false statement or information.

604. At the time Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer issued the "loan commitment" to the Plaintiff they did so with the purpose to deceive and/or injure the Plaintiff.

605. Additionally, and in the alternative, Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer have violated N.J.S.A. 2C:21-7 in that they have engaged in deceptive trade practices.

606. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer made false and misleading written statements for the purpose of wrongfully receiving the property of another without adequate consideration.

607. Specifically, the actions of Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer as set forth in all of the paragraphs of this Complaint were done with the intent of wrongfully depriving the Plaintiff of its money and property.

608. N.J.S.A. 2C:20-4 "Theft by Deception" provides in pertinent that "[a] A person is guilty of theft if he purposely obtains property of another by deception. A person deceives if he purposely….Creates or reinforces a false impression, including false impressions as to law, value, intention or other state of mind" or "prevents another from acquiring information which would affect his judgment of a transaction."

609. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer knowingly created a false impression that they would fund the loan to the Plaintiff.

610. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer have engaged in at least two incidents of racketeering conduct at least one of which has occurred after June 15, 1981, and the last of which has occurred within 10 years after a prior incident of racketeering activity.

611. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer (through Kennedy Funding, Inc.) have engaged in other incidents of racketeering conduct that has either the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents.

612. As a direct and proximate result of the aforementioned acts and omissions of Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer the Plaintiff has been damaged.

**WHEREFORE**, the Plaintiff demands judgment against Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer jointly, severally or in the alternative on COUNT ONE of its Complaint, for:

    a.    Ordering the divestiture of any interest held by the individual defendants, direct or indirect in the enterprise;

    b.    Imposing restrictions on the future activities and/or investments of the individual defendants, including but not limited to, the prohibition of engaging in the same type of endeavor as the enterprise found to be in violation of N.J.S.A. 2C:41-2;

    c.    Ordering the dissolution or reorganization of Kennedy Funding, Inc.

    d.    Ordering the denial, suspension or revocation of the charter of any corporation organized under the laws of the State of New Jersey;

e.    Entering a cease and desist Order specifying the acts or conduct which is to be discontinued;

f.    Ordering the restitution of any money or property unlawfully obtained or retained;

g.    Assessing civil monetary penalties against Kennedy Funding, Inc. and the individual defendants to deter future violations in an amount equal to three times the amount of the gain;

h.    Ordering Kennedy Funding, Inc. and the individual defendants to forfeit to the State of New Jersey any interest they have acquired and/or maintained in violation of New Jersey's RICO statutes and any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprises they have established, operated, controlled, conducted or participated in the conduct of in violation of New Jersey's RICO statutes.

i.    And the imposition of any or all of the foregoing sanctions in combination with each other;

j.    Treble damages to the Plaintiff;

k.    Attorneys fees, costs, costs of investigation, litigation and interest;

l.    For such further relief as the Court deems equitable and just;


## COUNT TWO
### (Unjust Enrichment)

613. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

614. The actions of Kennedy Funding in accepting and retaining an advance fee as partial payment of certain of the fees that would be due upon the closing of a loan which Kennedy funding never made amounts to the unjust enrichment of Kennedy Funding.

615. Kennedy Funding is in possession of funds belonging to the Plaintiff.

616. The total sum retained by Kennedy Funding is $160,000.00.

617. The Plaintiff received no benefit from Kennedy Funding to justify their receipt and retention of the funds.

618. Kennedy Funding did nothing to justify their retention of the advance fee paid to them by the Plaintiff.

619. The explicit terms of the documents referred to herein as "loan commitments" between the Plaintiff and Kennedy Funding– in two separate paragraphs – provide that the "loan commitment" will not be effective until such time as the total commitment fee has been paid and that such payment is due at the time of the closing on the proposed loan.

620. Kennedy Funding never agreed to close on the subject loan thus the balance due on the advance fee was never paid.  Consequently the "loan commitment" never could have become a binding contract between the parties.

621. Insofar as the closing between Kennedy Funding and the Plaintiff never occurred and because that was a precondition to the "loan commitment" becoming  binding agreements, allowing Kennedy Funding to retain the Plaintiff's advance fee would amount to unjust enrichment.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy Funding on COUNT TWO of its Complaint, for:

      a.      Compensatory damages;

      b.      Consequential damages;

      c.      Attorneys fees, costs and interest;

      d.      For such further relief as the Court deems equitable and just;

## COUNT THREE
### (Unjust Enrichment)

622. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

623. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc., have obtained funds belonging to the Plaintiff as an advance fee as partial payment of fees that would be due upon the closing of a loan which never was closed.

624. The actions of Kennedy Funding, Inc., Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer in accepting and retaining an advance fee as partial payment of fees that would be due upon the closing of a loan which Kennedy Funding and the Wolfer Defendants never made amounts to the unjust enrichment of Kennedy Funding and the Wolfer Defendants.

625. Kennedy Funding and the Wolfer Defendant are in possession of funds belonging to the Plaintiff.

626. The total sum being retained by Kennedy Funding and the Wolfer Defendants is $160,000.00.

627. The Plaintiff received no benefit from Kennedy Funding or the Wolfer Defendants to justify their receipt and retention of the funds.

628. Neither Kennedy Funding nor the Wolfer Defendant did anything to justify their retention of the advance fee paid to them by the Plaintiff.

629. The express and/or implied contract(s) between the Plaintiff and Kennedy Funding and the Wolfer Defendant was aborted due to mistake, impossibility and/or by the breach of Kennedy Funding and the Wolfer Defendants through no fault of the Plaintiff so as make their retention of the Plaintiff's advance fee unjust.

630. Insofar as Kennedy Funding and the Wolfer Defendants breached the express and/or implied loan agreements between themselves and the Plaintiff, allowing Kennedy Funding and the Wolfer Defendants to retain the Plaintiff's funds would amount to unjust enrichment.

631. Insofar as the Plaintiff justifiably relied to its detriment upon the assurances given to it by Kennedy Funding and the Wolfer Defendant that Kennedy Funding would fund the subject loan agreement, allowing Kennedy Funding and the Wolfer Defendant to retain the Plaintiff's funds would amount to unjust enrichment.

**WHEREFORE,** the Plaintiff demands judgment against Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. jointly, severally or in the alternative on COUNT THREE of its Complaint, for:

a. Compensatory damages;

b. Consequential damages;

c. Attorneys fees, costs and interest;

d. For such further relief as the Court deems equitable and just;

## COUNT FOUR
### (Breach Of Contract)

632. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

633. Kennedy Funding. entered into an agreement with the Plaintiff herein whereby Kennedy funding. promised and agreed to loan $28,000,000.00 to the Plaintiff.

634. The Plaintiff paid an advanced fee of $160,000.00 to Kennedy Funding for their commitment to loan funds to the Plaintiff.

635. In the event Kennedy Funding failed to make the aforementioned loan to the Plaintiff the advance fees paid by the Plaintiff to Kennedy Funding were to be returned to the Plaintiff.

636. The Plaintiff was ready willing and able to close on the loan.  Kennedy Funding failed and refused to loan $28,000,000.00 to the Plaintiff.

637. The Plaintiff requested the return of the advance fees paid by it to Kennedy Funding.

638. Kennedy Funding failed and refused to return the funds to the Plaintiff as per the agreement between the Plaintiff and Kennedy Funding.

639. Kennedy Funding wrongfully breached the "loan commitment" it had with the Plaintiff when it failed to loan the funds and thereafter refused to refund the advanced fees paid to them by the Plaintiff.

640. As a direct and proximate result of the breaches referenced in the preceding paragraphs, the Plaintiff has been damaged.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy Funding on COUNT FOUR of its Complaint, for:

      a.      Compensatory damages;

      b.      Consequential damages;

      c.      Attorneys fees, costs and interest;

      d.      For such further relief as the Court deems equitable and just;

## COUNT FIVE
### (Breach of the Covenant of Good Faith and Fair Dealing)

641.    The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

642.    Pursuant to the written agreement between the Plaintiff and Kennedy Funding, Kennedy Funding and the Wolfer Defendants had an affirmative duty of good faith and fair dealing with respect to their contractual relationship with the Plaintiff.

643.    Pursuant to the oral agreement between the Plaintiff and Kennedy Funding, Kennedy Funding and the Wolfer Defendants had an affirmative duty of good faith and fair dealing with respect to their contractual relationship with the Plaintiff.

644.    By failing to make good faith efforts to establish and interpret reasonable conditions to the commitment letter they issued to the Plaintiff, together with allowing reasonable time periods within which to permit the Plaintiff to obtain the additional documentation requested by Kennedy Funding and the Wolfer Defendants in the belatedly supplied closing checklist, together with Kennedy Funding and the Wolfer Defendants not having the funds available to close in any event, together with all of

the other wrongful acts of Kennedy Funding and the Wolfer Defendants including but not necessarily limited to the violations of New Jersey's RICO statutes, Kennedy Funding and the Wolfer Defendants have breach their duty of good faith and fair dealing owed to the Plaintiff.

645. As a direct and proximate result of the breach of the covenant of good faith and fair dealing by Kennedy Funding and the Wolfer Defendants, jointly severally or in the alternative, the Plaintiff has been damaged.

**WHEREFORE**, the Plaintiff demands judgment against Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. jointly, severally or in the alternative on COUNT FIVE of its Complaint, for:

    a.    Compensatory damages;

    b.    Punitive damages;

    c.    Attorneys fees, costs and interest;

    d.    For such further relief as the Court deems equitable and just;

## COUNT SIX
### (Common Law Fraud)

646. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

647. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc., made representations to the Plaintiff that they would loan the Plaintiff $28,000,000.00 in a commercial real estate loan.

648. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. made representations to the Plaintiff that they had $28,000,000.00 in their accounts in order to provide the Plaintiff with a commercial real estate loan.

649. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. made representations to the Plaintiff through the issuance of a "loan commitment".

650. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. made representations to the Plaintiff concerning the ability of the Kennedy Funding to make commercial real estate loans.

651. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. made representations to the Plaintiff concerning the manner in which the commercial real estate transaction would be consummated and what would occur should the commercial real estate loan not close.

652. Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. made representations to the Plaintiff concerning the manner in which the real property that was to act as collateral for the proposed loan would be evaluated using terms in the lending and real estate industry including but not limited to "loan commitment" and "evaluation" in order to induce the Plaintiff to pay an advance fee.

653. The representations made by Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. as aforesaid to the Plaintiff were false.

654. The aforesaid false representations made by Jeffrey Wolfer, Kevin Wolfer and Gregg Wolfer through their company, Kennedy Funding, Inc. to the Plaintiff were material.

655. Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. knew that the representations they were making were false at the time of their making the statements.

656. Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. knew that the representations they were making were deceptive at the time of their making the statements.

657. Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. made the false and deceptive representations with the intent that the Plaintiff would act in a manner reasonably contemplated.

658. Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. made the false and deceptive representations with the intent that the Plaintiff would pay the advance fee which they claimed was required in order to obtain a loan.

659. The Plaintiff was ignorant of the falsity and deceptive nature of the Defendants' representations as aforestated.

660. The Plaintiff relied upon the representations made by Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc.

661. Based upon the false and deceptive statements made to the Plaintiff by Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc., the Plaintiff paid the advance fee aforementioned.

662. The Plaintiff had the right to rely upon the representations of Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc.

663. The Plaintiff has suffered damages as a direct and proximate result of its reliance upon the false representations of the Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc.

664. Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. were assisted in their fraud by Bernard Volpe through his company, Volpe Real Estate Advisors.

665. Bernard Volpe is not qualified to act as an appraiser of real property.

666. Bernard Volpe knows he is not qualified to act as an appraiser of real property.

667. Bernard Volpe held himself out to the Plaintiff as a person competent to appraise real property.

668. The Plaintiff reasonably relied upon the representations made to him by KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE as they were engaged in a multi-million dollar transaction for the development of numerous homes.  The representations made by those defendants were consistent with what would be expected in consummating such a transaction.

669. Bernard Volpe did not comply with any standards applicable to the appraisal of real property.

670. KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knew or should have known that the Uniform Standards of Professional Appraisal Practice would not permit a lender to utilize an "evaluation" of property that was to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment".

671.    Despite KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knowing that the Uniform Standards of Professional Appraisal Practice would not permit a lender to utilize an "evaluation" of property that was to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment" they nonetheless permitted BERNARD VOLPE to conduct an "evaluation" of the subject property.

672.    KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knew or should have known that the Uniform Standards of Professional Appraisal Practice require a lender to utilize an "appraisal" of property that is to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment".

673.    Despite KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knowing that the Uniform Standards of Professional Appraisal Practice require a lender to utilize an "appraisal" of property that was to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment" they nonetheless permitted BERNARD VOLPE to conduct an "evaluation" of the subject property.

674.    KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knew or should have known that the Uniform Standards of Professional Appraisal Practice require a lender to utilize the services of a licensed appraiser to conduct an "appraisal" of property that is to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment".

675.    Despite KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE knowing that the Uniform Standards of Professional Appraisal Practice would require a lender to utilize the services of a licensed appraiser to conduct an "appraisal" of

property that was to act as collateral for the loan in matters such as was completed by Plaintiff's "loan commitment" they nonetheless permitted BERNARD VOLPE to conduct an "evaluation" of the subject property.

676.   As a result of KENNEDY FUNDING, the Wolfer Defendants and BERNARD VOLPE not complying with the aforementioned standards applicable to the determination of the value of real property when lending money to be secured by such collateral, they were able to concoct a "value" of the subject property which they felt would ensure that the Plaintiff would not be capable of closing on the proposed transaction and thereafter being forced to forfeit the advance fee that was paid.

677.   As a direct and proximate result of the aforementioned acts and knowing omissions on the part of KENNEDY FUNDING, the Wolfer Defendants, BERNARD VOLPE and VOLPE REAL ESTATE ADVISORS, the Plaintiff suffered pecuniary loss including but not limited to the purported forfeiture of the advance fee as aforementioned.

**WHEREFORE**, the Plaintiff demands judgment against Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. jointly, severally or in the alternative on COUNT SIX of its Complaint, for:

a.   Compensatory damages;

b.   Punitive damages;

c.   Attorneys fees, costs and interest;

d.   For such further relief as the Court deems equitable and just;

## COUNT SEVEN
### (New Jersey's Consumer Fraud Statute)

678. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

679. The actions of the Kennedy Funding and the Wolfer Defendant jointly, severally or in the alternative in inducing the Plaintiff to enter into commercial real estate loan agreements with no intention of ever consummating such loan amounts to deceptive trade practices in violation of New Jersey's Consumer Fraud Act.

**WHEREFORE**, the Plaintiff demands judgment against Jeffrey Wolfer, Kevin Wolfer, Gregg Wolfer and Kennedy Funding, Inc. jointly, severally or in the alternative on COUNT SEVEN of its Complaint, for:

      a.     Compensatory damages;

      b.     Punitive damages;

      c.     Attorneys fees, costs and interest;

      d.     For such further relief as the Court deems equitable and just.

## COUNT  EIGHT
### (Illusory Contract)

680. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

681. The "loan commitment" issued by the Kennedy Funding requires performance on the part of the borrower.

682. The "loan commitment" at issue in this matter makes performance on Kennedy Funding's part completely optional and within the Kennedy Funding's sole and unfettered discretion.

683. Kennedy Funding has taken the position that its obligation under the "loan commitment" is only to evaluate the collateral and make a loan offer based upon that evaluation.

684. Kennedy Funding's interpretation and application of the "loan commitment" is that the stated loan amount set forth in the "loan commitment" does not necessarily represent the amount of money that Kennedy Funding would loan to the borrower.

685. In determining the value of the collateral upon which the loan amount would be based Kennedy Funding relies exclusively on an utterly subjective method of evaluation which in and of itself makes the contract illusory as the loan amount can never be set forth with any certainty or specificity.

686. Kennedy Funding therefore is not bound to perform under any portion of the "loan commitment" unless it alone chooses to be bound.

687. Because the borrower is always obligated to perform under the "loan commitment" while performance on the part of Kennedy Funding is always in its sole and unfettered discretion, the "loan commitment" is an unenforceable illusory contract.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy Funding on COUNT EIGHT of its Complaint, for:

    a.    Rescission of the agreement between Kennedy Funding and the Plaintiff;

    b.    Return of all funds paid by Plaintiff to Kennedy Funding;

c.      Attorneys fees, costs and interest;

d.      For such further relief as the Court deems equitable and just;

## COUNT NINE
## (Void Option Contract)

688.    The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

689.    The "loan commitment" at issue in this matter makes performance on Kennedy Funding's part completely optional and within Kennedy Funding's sole discretion.

690.    The "loan commitment" at issue in this matter purports to allow Kennedy Funding to "[u]pon receipt of the determination of value by the third party appraiser, KFI will, at its option, either offer a Loan (not to exceed in any event the FINANCING REQUEST) of sixty percent (60%) of the "as completed" market value of the real estate Collateral with an initial advance (after deduction of the Completion Reserve) of sixty percent (60%) of the as is market value of the real estate Collateral as determined by said appraiser or return the paid portion of the commitment fee." (emphasis added)  Thus the "loan commitment" make performance completely optional and within the Kennedy Funding's sole discretion.

691.    Therefore the "commitment letter" attempted to create an option contract whereby Kennedy Funding had an option to loan funds to the Plaintiff should it so choose.

692.    Kennedy Funding provided no consideration to the Plaintiff for this option(s) to loan funds.

693.    The "loan commitment" is therefore void and unenforceable as a matter of law as a failed option contract.

694.    As a consequence of the creation of a void and unenforceable option contract, the Plaintiff has been damaged.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy Funding on COUNT NINE of its Complaint, for:

a.    Rescission of the agreement between Kennedy Funding and the Plaintiff;

b.    Return of all fund paid by the Plaintiff to Kennedy Funding;

c.    Attorneys fees, costs and interest;

d.    For such further relief as the Court deems equitable and just;

## COUNT TEN
## (DECLARATORY JUDGMENT)

695.    The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

696.    Kennedy Funding has taken the position that its obligation under the "loan commitment" is only to evaluate the collateral and make a loan offer based upon that evaluation.

697.    Kennedy Funding's interpretation and application of the "loan commitment" is that the stated loan amount set forth in the "loan commitment" does not necessarily represent the amount of money that Kennedy Funding is obligated to loan to the borrower.

698.  In determining the value of the collateral upon which the loan amount would be based Kennedy Funding relies exclusively on a utterly subjective method of evaluation which in and of itself makes the contract illusory as the loan amount is never set forth with any certainty or specificity.

699.  In determining the value of the collateral upon which the loan amount would be based the "loan commitment" provides that Kennedy Funding shall determine said value in its sole and exclusive discretion.

700.  The alleged "loan commitment" purports to permit Kennedy Funding to unilaterally make a one sided modification of a material term of the "loan commitment" that being the loan amount.

701.  The alleged "loan commitment" purports to require the borrower to accept whatever loan amount Kennedy Funding offers to make after completing its so-called evaluation of the value of the collateral and that should the borrower refuse to accept the modified loan amount for any reason whatsoever, then and in that event, the advance fee is forfeited.

702.  Furthermore, the advance fee required to be paid pursuant to the terms of the "loan commitment" is stated to be three percent of the stated loan amount or $1,940,000.00.

703.  However, the advance fee paid by the Plaintiff on account of the loan amount set forth in the "loan commitment" never changes regardless of whether Kennedy Funding elects to loan the amount set forth in the "loan commitment" or some lesser amount.

704.  Thus a material term of "loan commitment" – that being the loan amount – that would create a binding and enforceable contract, is not present.

705. It would be improper for a Court to impute to the "loan commitment" the amount of the loan to be made as such an element is a material term of loan agreements.

706. As a consequence of the omission of a material term to the "loan commitment", the Plaintiff has been damaged.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy on COUNT TEN of its Complaint, for:

    a.    Declaring the "loan commitment" to be void and unenforceable;

    b.    Rescission of the agreement between Kennedy Funding and the Plaintiff;

    c.    Return of all funds paid by the Plaintiff to Kennedy Funding;

    d.    Attorneys fees, costs and interest;

    e.    For such further relief as the Court deems equitable and just;

## COUNT ELEVEN
## (UNCONSCIONABLE CONTRACT)

707. The Plaintiff repeats and realleges all of the allegations and statements set forth in each of the preceding paragraphs as if set forth herein at length.

708. The "loan commitment" at issue in this matter is one such as no person not under a delusion would make on the one hand, and that no honest and fair person would accept on the other.

709. The adequacy of the consideration for "loan commitment" in this matter is grossly unreasonable or unconscionable in light of the mores and business practices of the time and place as to be unenforceable according to its literal terms.

710.    In the case at bar, there is grossly disproportionate bargaining power such that the principle of freedom to contract is non-existent and unilateral terms will result.

711.    In the case at bar the "loan commitment" is void as against public policy as the grossly unfair contractual provisions clearly tend to the injury of the public.

712.    Kennedy Funding holds itself out as being experts in what is known as commercial lending.  It specializes in an area of lending known as "hard money lending".  Its web-site uses phrases and guarantees to attract borrowers to its doors who are in desperate need of funds and have been unable to obtain financing from traditional lenders.  Additionally, it is a strong public policy to ensure that money lending is conducted in a fair and equitable manner.  The laws of usury have been adopted to prevent over-reaching.  Loan sharking has been criminalized.  The Federal Government has recently adopted the Patriot Act, which includes provisions concerning the lending of money in an effort to combat the financing of terrorists. Clearly there is a strong public policy to ensure orderly money lending transactions.

**WHEREFORE**, the Plaintiff demands judgment against Kennedy Funding and on COUNT ELEVEN of its Complaint, for:

a.    Declaring the "loan commitment" to be void and unenforceable as an unconscionable contract;

b.    Rescission of the agreement between Kennedy Funding and the Plaintiff;

c.    Return of all funds paid by the Plaintiff to Kennedy Funding;

d.    Attorneys fees, costs and interest;

e.    For such further relief as the Court deems equitable and just;

## REQUEST FOR DISCOVERY

Please be advised that pursuant to Federal Rule of Civ. Proc. 26, demand is hereby made

for all parties to this action to provide to the Plaintiff all discovery as to all issues.

## DESIGNATION OF TRIAL ATTORNEY

Please Take Notice, that Gregg D. Trautmann, Esq. of the law firm of Trautmann &

Associates, LLC, is hereby designated as trial attorney for the Plaintiff in the above captioned

matter.

TRAUTMANN & ASSOCIATES, LLC
Attorneys for Plaintiff

Date:  August 6, 2008                     By:   /s/ *Gregg D. Trautmann, Esq.*
                                                Gregg D. Trautmann, Esq.